**In re INDEPENDENT SERVICE ORGANIZATIONS ANTITRUST LITIGATION.**

This Document Applies To

**Creative Copier Services**

v.

**Xerox Corp.**

**No. CIV. A. 94–2502.
No. MDL–1021.**

United States District Court,
D. Kansas.

Feb. 16, 2000.

James A. Hennefer, San Francisco, CA, for Plaintiffs.

Peter K. Bleakley, Arnold & Porter, Washington, DC, Frederick Brown, Orrick, Herrington & Sutcliffe, San Francisco, CA, Peter W. Marshall, Xerox Corporation, Stamford, CT, C. Larry O'Rourke, E. Robert Yoches, Vincent P. Kovalick, Leslie I. Bookoff, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, DC, for defendant.

### MEMORANDUM AND ORDER

VRATIL, District Judge.

Creative Copier Services ("CCS") filed suit against Xerox Corporation, alleging that it violated the federal antitrust laws and state competition laws by refusing to sell copier parts to independent service organizations, tying its sale of parts and service, and disparaging CCS. Xerox filed a counterclaim alleging that CCS had infringed Xerox patents for various copier parts, Xerox copyrights for service manuals and Xerox trademarks associated with

copying machines. This matter is before the Court on the Xerox *Motion For Summary Judgment On Plaintiff's State Law Claims For "Defamation And Trade Disparagement" And Tortious Interference With Contract* (Doc. # 740) filed April 19, 1999; *Xerox Corporation's Motion For Summary Judgment On Plaintiff's Antitrust Claims* (Doc. # 746) filed April 19, 1999; *Xerox Corporation's Motion For Summary Judgment On Plaintiff's Antitrust Claims Barred By The Statute Of Limitations* (Doc. # 742) filed April 19, 1999; *Xerox Corporation's Motion For Summary Judgment On Its Copyright Infringement Counterclaims* (Doc. # 744) filed April 19, 1999; *Xerox Corporation's Motion For Summary Judgment On Patent Infringement* (Doc. # 735) filed March 19, 1999; *Cross Motion By Creative Copier Service For Summary Judgment On Xerox's Patent Infringement Counterclaim* (Doc. # 756) filed May 3, 1999; *Xerox Corporation's Motion To Strike The Declaration Of Donald Gavin* (Doc. # 766) filed June 1, 1999; and *Motion By Creative Copier Service To Deem Admitted Matters Pursuant To Local Rule 56.1 And The Order Of April 21, 1999, And To Strike Matters From Xerox Reply Memoranda* (Doc. # 784) filed June 28, 1999. After carefully considering the parties' briefs and pertinent portions of the record, the Court is prepared to rule.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics*, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

### Discussion

**I. State Law Claims by CCS**

**A. *Factual Background***

For purposes of the Xerox motion for summary judgment on plaintiff's state law

claims, the following facts are undisputed, deemed admitted, or where disputed, viewed in the light most favorable to CCS.

Xerox, a New York corporation with its principal offices in Connecticut, is engaged in the business of inventing, manufacturing, selling and servicing copiers. In 1981, William Dixon, a former Xerox employee, founded Creative Copier Services ("CCS"), a sole proprietorship which has its principal place of business in Middletown, Connecticut. CCS is an independent service organization ("ISO") which services and maintains Xerox copiers. CCS focused its service on the 10 Series of Xerox high volume copiers. These included the 1090 model which makes 90 copies per minute, the 1075 model which makes 75 copies per minute, and the 1065 model which makes 65 copies per minute. *See* Stat. of Lim. SOF ¶ 25; Antitrust SOF ¶ 3.[1] CCS also serviced a small number of model 9900 high volume copiers, and several lower volume Xerox copiers.

On August 18, 1988, Xerox had a national parts verification program. On that date Peggy Murphy, who headed the program, circulated a form letter for Xerox managers to use when former service representatives for Xerox crossed over and joined independent service organizations. *See* State Claims SOF ¶ 38; Stat. of Lim. SOF ¶ 125. The letter stated in part:

> Recently, _____, the Customer Service Engineer who had been servicing your _____ equipment, terminated his (her) employment with Xerox to join an independent service organization.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> [Y]ou may be approached by _____, in his (her) new capacity

with a proposal to terminate your Service Contract with Xerox and sign on with the independent service organization he (she) now represents. It is important for you to understand that while _____ is fully trained on the products he (she) once serviced, he (she) no longer has the benefit of the intensive, ongoing training available to a Xerox Customer Service Engineer. In addition, the independent service organization would not be given access by Xerox to the knowledge required to service Xerox equipment introduced with new technology or other know-how developed by Xerox in the future.

State Claims SOF ¶ 38; Stat. of Lim. SOF ¶ 126.

After a national meeting of Xerox employees in November 1988, Joseph Nugent, the district service manager for Xerox in Hartford, noted in a memorandum to other employees that CCS and Dixon wanted to service Xerox model 1075/1090 and other low volume copiers. Nugent also noted that Dixon was a minority, got state business and was going after government contracts. *See* State Claims SOF ¶ 32.

In the "Selling Guide" section of an internal memorandum dated December 9, 1988, Xerox stated that it had a nationwide parts availability program and a "computerized parts inventory process to ensure efficient turnaround on parts replacements." *Id.* ¶ 39. Xerox also noted that ISOs "may not have the capital" to stock the parts needed to support all service calls. *Id.* ¶ 41.

In 1989, Xerox published an internal guideline of five items which Xerox em-

---

**1.** "Antitrust SOF ¶ " will refer to factual statements by CCS and Xerox in briefing on *Xerox Corporation's Motion For Summary Judgment On Plaintiff's Antitrust Claims* (Doc. # 746) filed April 19, 1999. "Stat. of Lim. SOF ¶ " will refer to factual statements by CCS and Xerox in briefing on *Xerox Corporation's Motion For Summary Judgment On Plaintiff's Antitrust Claims Barred By The Statute Of Limitations* (Doc. # 742) filed April 19, 1999.

"State Claims SOF ¶ " will refer to factual statements by CCS and Xerox in briefing on Xerox's *Motion For Summary Judgment On Plaintiff's State Law Claims For "Defamation And Trade Disparagement" And Tortious Interference With Contract* (Doc. # 740) filed April 19, 1999. The Court has included several factual statements from the briefing on plaintiff's antitrust claims in this section for background purposes only.

ployees "[could] not say" to customers or potential customers:

> You cannot disparage the independent service organizations or its employees in any manner.
>
> While independent service organizations' service engineers may have been trained by Xerox initially, they do not have access to current Xerox technical publications or the knowledge required to service Xerox equipment introduced with new technology.
>
> Independent service organizations cannot get parts to service Xerox's newest products.
>
> An independent service organization does not have the ability to obtain an adequate supply of replacement parts to service Xerox equipment.
>
> Independent service organizations deal or may be dealing in stolen or illegally obtained parts.

State Claims SOF ¶ 36.

On January 26, 1990, at a meeting of regional district managers for Xerox, Xerox discussed CCS and included it in a list of major ISOs in the United States. *See* State Claims SOF ¶ 33. In a memorandum circulated after the meeting, Xerox noted that Cigna was the primary account of CCS and that CCS leveraged minority ownership. *See id.*

In September 1994, Xerox provided Nugent a script to use in competing against ISOs. It stated:

> [P]arts [are] at the fingertips of our technicians.... Xerox Parts and Logistics Distribution system makes it possible for Xerox Service technicians to obtain any part within 24 hours.... Our system allows us to locate and deliver any part overnight, so you [w]on't be left out in the cold when you need your equipment most.
>
> Xerox service technicians would never install a "stripped" or "replica" part to maintain your equipment.
>
> When considering an alternative service provider for your Xerox equipment, consider the training and skill level of the technicians that will be keeping your

equipment up, running and producing for you.

State Claims SOF ¶¶ 40, 42, 44; Stat. of Lim. SOF ¶¶ 37, 82.

CCS claims that Xerox representatives disparaged CCS to several customers, including Cigna Insurance, Aetna Insurance and the State of Connecticut. Martin Klagholtz, who worked for Xerox as an Accounts Manager through April 1989, testified that Xerox representatives emphasized to potential customers that third party service organizations would have difficulty obtaining parts. *See* State Claims SOF ¶¶ 45–46; Deposition of R. Martin Klagholtz at 26–27, attached as Exhibit 12 to CCS Consolidated Appendix—Volume I (Doc. # 775) filed June 2, 1999. Klagholtz testified, however, that he did not have any personal knowledge that Xerox had disparaged CCS to potential or actual customers. *See id.* at 71–84. Jim Blake, a CCS technician who had previously worked for Xerox, testified that Xerox technicians told him that Xerox sales representatives were telling customers that CCS could not obtain parts. *See* State Claims SOF ¶ 52; Deposition of James W. Blake, III at 75, attached as Exhibit 4 to Consolidated Appendix—Volume I (Doc. # 775). The record of disparagement is as follows:

> *Statements to Aetna Insurance:* DeRon Franklin, who was responsible for copier service at Aetna, testified that Xerox told him that third party providers such as CCS "might have problems as far as getting parts" and that they would not get any training. *See* State Claims SOF ¶ 10; Deposition of DeRon Franklin at 12, attached as Exhibit 10 to Consolidated Appendix—Volume I (Doc. # 775). Also, Xerox emphasized that CCS might "not be able to obtain parts as quickly as Xerox." *See id.* Franklin told Jackie Dixon, who kept the books and oversaw the dispatch of technicians for CCS, that according to Xerox, CCS "services their machines by using paper clips and rubber bands." *See* State Claims SOF ¶ 53. Michael Davis, a manager for corporate purchasing at Aetna, testified that ac-

cording to his employees, Xerox service representatives said that their copiers failed because they were not using Xerox paper or Xerox service. *See* State Claims SOF ¶ 51; Deposition of Michael Davis at 13–14, attached as Exhibit 6 to Consolidated Appendix—Volume I (Doc. # 775).

*Statements to the State of Connecticut:* Beginning in 1981, CCS serviced copiers for the State of Connecticut. *See* Stat. of Lim. SOF ¶ 133; State Claims SOF ¶ 56. According to Edward Jones, purchasing agent for the State, "[state] agencies would call [him] saying Xerox is in there trying to tell horror stories about independent contractors." *See* State Claims SOF ¶¶ 12, 56; Jones Depo. at 21–22. Jones had no personal knowledge, however, of disparaging comments. He was only aware of comments by State employees. *See id.*

In 1986 or 1987, CCS started bidding for service on the 10 series copiers which the State owned or leased. *See* Stat. of Lim. SOF ¶ 133. The bid specifications required bidders to demonstrate proof of ability to obtain Xerox parts. In 1989, the State re-bid the service contract. *See id.* ¶ 134. Xerox and CCS were the only two bidders for the 10 series repair business, but CCS was forced to withdraw its bid because of Xerox parts policies. *See* State Claims SOF ¶ 57; Stat. of Lim. SOF ¶¶ 134–35. The State subsequently awarded Xerox the bid. *See* State Claims SOF ¶ 57; Stat. of Lim. SOF ¶ 134.

**B. *CCS Defamation Claim***

▇ To establish a claim for defamation or trade disparagement, CCS must establish that without privilege, Xerox injured it through publication of false statements to third parties. *See Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.,* 234 Conn. 1, 662 A.2d 89, 102 (1995); *Thomas v. Saint Francis Hosp. & Med. Ctr.,* 990 F.Supp. 81, 92 (D.Conn.1998). Xerox ar-

gues that CCS has failed to produce admissible evidence that it published false comments regarding CCS.

▇ Initially, the Court notes that most of the purported evidence of defamation is inadmissible. CCS contends that the Klagholtz statement is admissible because he "clearly had personal knowledge, and indeed named people who had made the statements." *Response By Creative Copier Service To Xerox Motion For Summary Judgment On Plaintiff's State Law Claims For Defamation And Trade Disparagement And Tortious Interference With Contract* (Doc. # 774) filed June 2, 1999, at 18. Likewise CCS maintains that Blake had direct knowledge that Xerox defamed CCS. *See id.* Klagholtz and Blake, however, did not hear the defamatory statements; they learned of them from second hand sources. CCS has not shown that their testimony satisfies any exception to the hearsay rule. Thus the Court disregards the evidence of such statements.

▇ CCS claims that because employees of Jones and Davis reported defamatory statements in the normal course of their employment, the statements of Jones and Davis are admissible under the business records exception to the hearsay rule.[2] See Fed.R.Evid. 803(6). The business records exception applies only to written or tangible documents, however, and not to oral statements of employees. *See id.* (applies to a "memorandum, report, record or data compilation"). The oral statements of an employee, stored in the mind of the individual who heard the statements, lack the indicia of trustworthiness associated with tangible business records prepared at or near the time the information was transmitted. *See United States v. Kindred,* 918 F.2d 485, 487 n. 2 (5th Cir.1990) (regular business reports more reliable than oral hearsay statements). Moreover, even if the oral statements were within the scope of the business records exception, CCS has not shown that the employees who reported the Xerox statements to

---

**2.** This argument assumes, incorrectly, that the employees were employed by Jones and Davis

rather than by Aetna Insurance and the State of Connecticut.

Jones and Davis had personal knowledge of the statements, that Jones and Davis kept such statements in their minds in the regular course of business activity, or that the regular practice of their business activity was to keep such reports stored in individual memory banks. *See* Fed. R.Evid. 803(6). Accordingly, the Court excludes the statements of Jones and Davis.

At Aetna, Franklin did have personal knowledge of statements by Xerox representatives. Xerox told Franklin that CCS might have problems getting parts as quickly as Xerox and that "they wouldn't get any training." *See* State Claims SOF ¶ 10. With respect to its inability to timely obtain parts, CCS has admitted the truth of the allegedly defamatory statement. CCS has identified numerous occasions when it could not obtain necessary parts quickly enough to service copiers for its customers. *See* CCS factual statements in support of its antitrust claim; Stat. of Lim. SOF ¶¶ 113–14. Most importantly, Franklin himself testified that CCS took longer than Xerox to obtain parts and that CCS experienced difficulty obtaining parts from Xerox. *See* Franklin Depo. at 7–10, Exh. 10 to Consolidated Appendix—Volume I (Doc. # 775). Accordingly, no reasonable jury could find that the statement was defamatory with regard to CCS or its ability to obtain parts.

■ A jury could find, however, that Xerox defamed CCS when it discussed training with Aetna representatives. Xerox ignores this statement in its briefing. *See Xerox Corporation Reply Memorandum In Support Of Its Motion For Summary Judgment On Plaintiff's State Law Claims For "Defamation and Trade Disparagement" And Tortious Interference With Contract* (Doc. # 781) filed June 15, 1999, at 36 (stating that only evidence regarding CCS lack of training was internal memorandum). Viewed in the light most favorable to CCS, the record shows that Xerox asserted that CCS technicians were untrained and therefore incompetent. Although the Franklin testimony of resulting injury from the statement is uncertain,

CCS may rely on the theory of slander per se. *See Proto v. Bridgeport Herald Corp.,* 136 Conn. 557, 72 A.2d 820, 826 (1950) (statements charging general incompetence are slanderous per se). "When the defamatory words are actionable per se, the law conclusively presumes the existence of injury to the plaintiff's reputation. He is required neither to plead nor to prove it." *Torosyan,* 662 A.2d at 106.

■ Relying on *Nemeth v. Carroll,* No. CV910283873, 1998 WL 165036 (Conn.Super.Ct. March 30, 1998), Xerox argues that CCS cannot recover for slander per se because it is an unincorporated entity. In *Nemeth,* the court noted that defendant's statements charged plaintiffs with incompetence or lack of integrity and that such statements were slanderous per se. *See id.* at \*3. From that case, although plaintiffs happened to be one corporation and its two owners, Xerox deduces that statements are not slanderous per se unless they refer to business *owners* rather than to the business itself. The court in *Nemeth* did not make this distinction and Xerox has not cited authority for the proposition that unincorporated or other business entities may not recover damages for defamation per se. *See, e.g., Swengler v. ITT Corp. Electro–Optical Prods. Div.,* 993 F.2d 1063, 1071 (4th Cir.1993) (corporation may be defamed per se) (Virginia law); *Imperial Developers, Inc. v. Seaboard Surety Co.,* 518 N.W.2d 623, 627 (Minn.Ct. App.1994) (same, Minnesota law). Accordingly, the Court finds that the Xerox statement on training is sufficient to support the CCS defamation claim. The Court overrules the Xerox motion for summary judgment on this issue.

■ CCS next maintains that the Murphy letter to Xerox district employees was defamatory. That communication included a form letter which could go to Xerox customers when a service technician quit Xerox and defected to an ISO. The form letter stated that Xerox would not give ISOs information necessary to service equipment which Xerox introduced with new technology or future know-how. The

form letter also stated that Xerox, and to its knowledge Xerox vendors, did not sell parts for the 10 and 50 series copiers, or unique parts for the model 9900, to ISOs. Xerox argues that CCS has not shown that it published this document to a third party, a necessary element of defamation.

Under Connecticut law, distribution among Xerox employees is sufficient. *See Torosyan*, 662 A.2d at 103 (intracorporate communications may constitute "publication" of defamatory statement) (citing 3 Restatement (Second) of Torts § 577(1) and comment (i) (1977)). The internal publication is not actionable in this case, however, because CCS has not shown that the information reached its customers or potential customers. Thus CCS cannot establish any injury from the publication.[3]

■ Moreover, even if Xerox had published the Murphy letter to CCS customers, the record contains no evidence that its statements were false. Xerox did refuse to provide training and parts to ISOs facts which are the primary basis of the CCS antitrust claim. Moreover, the form letter goes on to say that "this is not to say that an independent service organization does not have the ability to obtain an adequate supply of replacement parts from other sources to service Xerox equipment." In light of this disclaimer, no reasonable jury could find that the Xerox form letter made false statements. *See Lyons*, 1998 WL 309797, at *4 ("[W]ords must be viewed in the context of the entire statement and the surrounding circumstances").

CCS likewise argues that Xerox defamed it through its script for competing with ISOs (which went to Nugent, the district service manager for Xerox in Hartford) and the notes which Nugent made about CCS and distributed to other Xerox employees. Both the script and the notes emphasized that Xerox service technicians could obtain any part within 24 hours, that ISOs might not have the capital to support all service calls, that Xerox would never install a "stripped" or "replica" part, and that potential customers should consider the training and skill level of alternative service providers. In his notes Nugent stated that Dixon (the CCS founder) was a minority, got state business and was going after government contracts. Again, although Xerox internally published the script and notes to its employees, CCS has failed to show harm which resulted from such publication. Even if Xerox had published the statements to CCS customers or potential customers, the record contains no evidence that the statements were false. Even CCS employees testified that CCS could not build a parts inventory which was adequate to meet its servicing needs. *See* Stat. of Lim. SOF ¶ 110. They also admitted that they stripped parts from CCS machines and used replica replacement parts made by third parties. *See* State Claims SOF ¶ 42.

Finally, CCS contends that Xerox disparaged it by telling its customers that it serviced copiers by using paper clips and rubber bands. *See* State Claims SOF ¶ 53. Franklin (at Aetna) allegedly reported this statement to Jackie Dixon (at CCS). Once again, however, the Court must exclude this testimony as hearsay. No evidence suggests that Jackie Dixon had personal knowledge of the comments and CCS has not shown that any exception to the hearsay rule applies.[4]

For the above reasons, the Court overrules the Xerox motion for summary judg-

---

**3.** Because CCS has not shown that the Murphy letter is defamatory on its face, CCS cannot invoke the theory of slander per se. *See Lyons v. Heid*, 1998 WL 309797, at *6 (Conn.Super.Ct. May 29, 1998). In addition, the internal publication of the Murphy letter also may be privileged as a communication between individuals with a common interest in a particular subject matter. *See* Restate-

ment (Second) of Torts § 596; *Torosyan*, 662 A.2d at 103.

**4.** CCS also cites an internal Xerox memorandum titled "Current Status Of Major ISOs" which states that CCS "leverages minority ownership." *See* State Claims SOF ¶ 33. CCS has not shown that the statement was false or caused any injury to it. Indeed, the memorandum suggests that Xerox used the

ment on the CCS defamation claim that Xerox told Aetna representatives that CCS technicians would not obtain any training. Otherwise, the Xerox motion is sustained.

### C. CCS Claim Of Tortious Interference With Contract

 CCS claims that through its parts policies and disparagement, Xerox tortiously interfered with plaintiff's contract with the State of Connecticut through delays in shipment and disparagement. In order to maintain a cause of action for tortious interference with an existing contract, plaintiff must establish (1) the existence of a contract with the State of Connecticut; (2) knowledge of the contract by Xerox; (3) intent to interfere with the contract by Xerox; and (4) actual loss to CCS because of that conduct. *See Solomon v. Aberman,* 196 Conn. 359, 493 A.2d 193, 206 (1985); *Hart, Nininger & Campbell Assocs., Inc. v. Rogers,* 16 Conn. App. 619, 548 A.2d 758, 764 (1988).[5] CCS must prove that Xerox's conduct was in fact tortious, which may be satisfied by proof of fraud, misrepresentation, intimidation, molestation or malice. *See Solomon,* 493 A.2d at 197; *Croslan v. Housing Auth.,* 974 F.Supp. 161, 167 (D.Conn.1997). "The burden is on plaintiff to plead and prove at least some improper motive or improper means." *Solomon,* 493 A.2d at 197.

In 1989, Xerox and CCS submitted the only two bids to service the 10 Series and other Xerox copiers with the State of Connecticut. The State awarded the bid to CCS. CCS alleges that it had to withdraw its bid because it could not acquire copier parts on a timely basis. Xerox argues that for reasons set forth in its motion for summary judgment on the antitrust claims, its parts policies were not illegal or

tortious. In its briefing of the CCS antitrust claims, however, Xerox did not discuss the legality of delayed shipment of parts to ISOs. CCS has presented evidence that it lost the State of Connecticut contract because Xerox delayed such shipments. Xerox has not attempted to justify such delays and a jury could reasonably infer that they resulted from malice. *See Dowling v. First Federal Bank,* No. CV94–0533172 S, 1995 WL 405827, at *1 (Conn.Super.Ct.1995) (malice may include any intentional interference without justification) (citing Restatement (Second) of Torts § 766); *see also Dowling,* 1995 WL 405827, at *2 (if actor motivated in whole or in part by desire to interfere with other's contractual relations, the interference is almost certain to be held improper) (quoting Restatement (Second) of Torts § 767, comment (d)); *id.* § 767, comment (c) (economic pressure may be improper in some circumstances). The Court therefore overrules the motion on the claim of tortious interference with contract based on Xerox parts policies.

Xerox argues that CCS has not produced admissible evidence that it disparaged CCS to the State of Connecticut. As explained above, the testimony of Ed Jones regarding such alleged disparagement is hearsay. Even if Xerox had made the alleged statements, CCS has not shown that it suffered any loss resulting therefrom. Accordingly, the Court sustains the Xerox motion for summary judgment on the CCS claim of tortious interference with contract based on disparagement.

### II. CCS Antitrust Claims

CCS advances two antitrust claims, claiming monopolization of both the parts and service markets for high volume copiers.[6] Its first claim, for parts market mo-

---

information internally and did not intend to use it as a marketing tool.

**5.** CCS argues that Xerox also interfered with other contracts. The tortious interference claim, however, is solely based upon the contract between CCS and the State of Connecticut. *See* Amended Complaint (Doc. # 246)

¶¶ 98–102. CCS has not sought leave to amend. Accordingly, the Court will not consider evidence of alleged interference with other contracts.

**6.** CCS also alleges that Xerox instituted various policies and actions in an "effort to force" customers to accept Xerox as the provider for

nopolization, is that Xerox unlawfully monopolized the relevant market for high volume copier parts by prohibiting its controlled subsidiaries, Rank Xerox and Xerox Canada, from selling parts in the United States. *See CCS' First Amended Complaint For Damages (With Jury Trial ·Demand) And For Injunctive Relief* (Doc. # 246) filed March 5, 1996, ¶¶ 86 & 88; Antitrust SOF ¶ 14. The second antitrust claim, a service market monopolization claim, is that Xerox unlawfully monopolized or attempted to monopolize the relevant markets for service of high volume copiers. *See Amended Complaint* (Doc. # 246) ¶¶ 76–84. CCS specifically alleges that Xerox monopolized or attempted to monopolize these markets by disparaging CCS and by refusing to sell critical replacement parts which CCS needed to repair Xerox copiers under service contracts. *See.* Antitrust SOF ¶¶ 17, 36.

Xerox seeks summary judgment on both antitrust claims. As to the parts market monopolization claim, Xerox argues that CCS cannot prove that it willfully acquired

both parts and service. CCS alleges that this conduct constitutes an unlawful tying arrangement in violation of Section 2 of the Sherman Act. *See Amended Complaint* (Doc. # 246) ¶¶ 1, 83, 90. As an initial matter, the Court notes that the amended complaint does not allege the requisite elements of a tying claim. The Court therefore does not construe the tying claim as an independent claim for relief, but rather a subset of the claim that Xerox monopolized or attempted to monopolize the relevant parts and service markets in violation of Section 2 of the Sherman Act.

Tying claims generally are brought under Section 1 of the Sherman Act, and the elements of a tying claim under either Section 1 or 2 of the Sherman Act include:

(1) an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product [or service], or at least agrees that he will not purchase that product [or service] from any other supplier;

(2) the seller has "appreciable economic power" in the tying product market to compel acceptance of the tied product; and

(3) the arrangement affects a substantial volume of commerce in the tied market. *Kodak*, 504 U.S. at 462, 112 S.Ct. 2072; *see Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d 1137, 1143 n. 2 (10th Cir.1997). Because the amended complaint does not allege an actionable tying claim, the Court grants summary judgment in favor of Xerox on that issue.

Xerox also argues that CCS has not shown that Xerox conditioned its sale of parts on the purchase of service. CCS responds that its claim is cognizable under the Supreme Court decision in *Kodak*. In *Kodak*, the Supreme Court noted that a fundamental element of a tying claim is a conditioned sale, *i.e.* "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Kodak*,

504 U.S. at 461, 112 S.Ct. 2072 (quoting *Northern Pacific R.R. Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)). In *Kodak*, plaintiffs alleged that Kodak sold parts to third parties only "on condition" that they also buy service from Kodak. *See id.* at 463 n. 8, 112 S.Ct. 2072. Here, CCS does not allege that Xerox expressly conditioned its sale of parts on a customer's purchase of service from Xerox or a customer's promise not to purchase service from ISOs. Indeed, at least three customers purchased parts from Xerox for copiers while CCS provided service on those copiers. *See* Antitrust SOF ¶ 6. Thus the *Kodak* decision does not support the CCS tying claim.

Although most tying claims consist of an express agreement, an alleged tying arrangement may be premised on a defendant's policy which makes the purchase of the tying and tied product together "the only viable economic option." *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1500 (8th Cir.1992), *cert. denied*, 506 U.S. 1080, 113 S.Ct. 1048, 122 L.Ed.2d 356 (1993); *Nobel Scientific Indus., Inc. v. Beckman Instruments, Inc.*, 670 F.Supp. 1313, 1324 (D.Md.1986); *Ways and Means, Inc. v. IVAC Corp.*, 506 F.Supp. 697, 701 (N.D.Cal.1979)), *aff'd*, 831 F.2d 537 (4th Cir.1987), *cert. denied*, 487 U.S. 1226, 108 S.Ct. 2886, 101 L.Ed.2d 920 (1988). Other courts have found that an implicit tying arrangement "may be inferred from evidence indicating that the supplier has actually coerced the purchase or non-purchase of another product." *Data General*, 36 F.3d at 1180. CCS has not offered any evidence, or legal argument, to support the finding of an implicit tying arrangement. In particular, CCS has not identified any customers that were actually coerced by Xerox to purchase both parts and service.

For· these reasons, the Court sustains the Xerox motion for summary judgment on the CCS tying claim.

or maintained monopoly power in the relevant market through anticompetitive means, as required by Section 2 of the Sherman Act, "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." As to the service market monopolization claim, Xerox first argues that as a patentee it could unilaterally exclude others from using its inventions, even if such conduct allowed it to obtain monopolies in relevant markets, and that consequently its refusal to sell patented parts to CCS does not give rise to antitrust liability. Xerox claims that it is entitled to summary judgment because CCS has not disaggregated those damages which are attributable to its lawful refusal to sell patented parts. Xerox also argues that disparagement of CCS does not constitute an antitrust violation and that CCS cannot show injury attributable to other Xerox practices. *See Xerox Corporation's Motion For Summary Judgment On Plaintiff's Antitrust Claims* (Doc. # 746) filed April 19, 1999.

## A. *Factual Background*

In briefing the antitrust issues, the parties have incorporated factual material from the briefs on two other motions: the *Motion For Summary Judgment On Plaintiff's State Law Claims For "Defamation And Trade Disparagement" And Tortious Interference With Contract* (Doc. # 740) which Xerox filed April 19, 1999, and *Xerox Corporation's Motion For Summary Judgment On Plaintiff's Antitrust Claims Barred By The Statute Of Limitations* (Doc. # 742) filed April 19, 1999. *See* Antitrust SOF ¶¶ 17, 87; Stat. of Lim. SOF ¶ 127. The Court has therefore considered and relied on such materials in evaluating the pending motion. For purposes of this motion, the Court also incorporates by reference the factual background regarding the CCS state law claims, *supra* part I. Consequently the following facts are undisputed, deemed admitted or, where disputed, viewed in the light most favorable to plaintiff.

### 1. *Xerox Parts Policies*

Xerox competed with CCS to service Xerox brand copiers, particularly in Hartford, Connecticut. *See* Stat. of Lim. SOF ¶ 37. In 1984, Xerox decided that it would sell replacement parts for its "10 series" copiers to end users and authorized service resellers, but not to ISOs.[7] See id. ¶ 3; Antitrust SOF ¶ 4. In January 1987, Xerox extended this policy to its newer 9 series and 50 series copiers. *See* Stat. of Lim. SOF ¶ 10. CCS alleges that as a result of this policy, its ability to purchase restricted parts from Xerox became the exception rather than the norm. *See id.*

Xerox recognized that ISOs were a competitive threat in the copier service market. In August 1988, a Xerox employee noted in a memorandum that "[s]ervice accounts for more than half of Xerox' revenue" and that

Third party service of Xerox equipment is emerging as a multimillion dollar business. The result is a reduction in Xerox service revenue. D. Kerns and P. Allair[e] [President of Xerox] have expressed concern about third party service and have requested that a strategy be developed to stop the revenue loss.

Stat. of Lim. SOF ¶ 28–29. On October 21, 1988, senior partners of Xerox developed an action plan against ISOs. *See id.* ¶ 73. The plan targeted six major ISOs in five districts, including CCS in the Hartford district. *See id.* The plan proposed to strengthen Xerox policy on the sale of parts by concentrating on these six ISOs, by requiring end-user verification, use of on-site/physical tracing, and outright refusal to sell replacement parts to ISOs. It also proposed to eliminate sale of all service bulletins and technical documentation to ISOs. Finally, except as to equipment serviced by Xerox certified service engineers, the policy proposed to eliminate time and materials service calls and negate warranties for equipment and parts. *See id.*

**7.** The "10 series" copiers include models 1065, 1075 and 1090.

On January 11, 1989, Xerox formally adopted its "On–Site End–User Verification Procedure." *See* Stat. of Lim. SOF ¶ 80. Pursuant to the policy, Xerox would sell parts only to an "end-user," which it defined as a person who (1) owned the equipment for which the parts were to be purchased; (2) used the equipment solely for internal purposes; and (3) would use the parts solely to maintain the particular equipment. *See id.* ¶ 80. In January 1989, Xerox implemented this policy against the six target ISOs including CCS. *See id.* ¶ 87. The policy applied to the 1065, 1075, 1090, 9900 and 50 series copiers. *See id.* ¶ 88.

The new procedure required the following steps whenever CCS (or the other target ISOs) ordered a replacement part:

(1) The Xerox Parts Marketing Center informed the ISO that Xerox required the serial number of each machine for which the part was ordered; that the serial number had to match the machine at the customer location; that a bill of sale no longer constituted the sole vehicle for end-user verification; and that an on-site visit by a Xerox representative might be required.

(2) If the ISO refused an on-site visit, the operator informed the ISO that Xerox refused the order.

(3) If the ISO did not refuse an on-site visit, the operator provided a Xerox Service Marketing Representative the ISO name, the serial number of the machine for which the part was being ordered, and a list of the parts ordered for each serial number.

(4) The Xerox Service Marketing representative gave the required information to the Xerox district office and requested 48–hour turnaround for the on-site verification. If the district office did not perform the on-site visit within 48 hours, Xerox would ship the requested part(s).

(5) If the on-site visit confirmed that the equipment was at the ISO site and the ISO was within the definition of an "end-user," the Xerox Service Marketing Representative told the Parts Marketing

Center to ship the order. If the equipment was not at the ISO site or the ISO was not an "end-user," the Service Marketing Representative told the Parts Marketing department to notify the ISO that the parts would not be shipped because Xerox could not verify "end-user" status.

Stat. of Lim. SOF ¶ 90.

Xerox appointed two service marketing center employees to supervise the verification program nationwide: Murphy, who headed the national parts verification program, and David Spindel, Xerox manager for service marketing. *See id.* ¶ 92. In the Hartford district, Xerox also assigned Ward Rogers and Pete Chandry to monitor CCS under the verification policy. *See id.* ¶¶ 92–93. Xerox employees were directed to contact Rogers or Chandry before any parts were released to CCS. *See id.* ¶ 93. Nugent, the Xerox district manager, confirmed that whenever CCS ordered a part under this procedure, Xerox verified the purchase order. *See id.* ¶ 99.

On April 17, 1989, CCS ordered seven manuals for 9900 copiers which it was servicing for Cigna and Aetna. Xerox canceled the order, which totaled $770.40. *See id.* ¶ 122. On April 19, 1989, Xerox sent CCS a letter which explained that Xerox had recently decided not to sell service documentation on high-volume copier products or restricted products. *See id.* ¶ 123.

Effective June 1, 1989, Xerox announced a new verification policy to ensure that ISOs complied with the parts policy. *See id.* ¶ 16. Xerox stated that it would not knowingly provide ISOs with parts, technical training, technical documentation, or other resources for 10 series copiers. *See id.* ¶ 124. On June 30, 1989 Xerox described this policy in a letter to an end-user (Cessna Aircraft), as follows:

For restricted products, Xerox will not knowingly provide independent service organizations with parts unless the independent service organization is the end-user of the equipment for which the

parts have been ordered and such parts will be used to maintain that equipment. Xerox will not deal with an end-user through an independent service organization acting as the user's agent or intermediary.

When an end-user does purchase parts, the "ship to" address must be the same as the "bill to" address unless it is a different address of the same company. *Id.* ¶ 98.

In 1989, Xerox began to strictly enforce its restrictions on CCS parts orders. *See id.* ¶ 110. Theodore Bethea, who ordered parts for CCS, testified that the restrictions prevented CCS from developing an adequate parts inventory. *See id.* According to Jackie Dixon, who kept the books and oversaw the dispatch of CCS technicians, CCS had difficulty obtaining parts from 1988 through 1994, causing delays up to one week in copier service. *See id.* ¶ 114.

On March 24, 1992, certain plaintiffs filed a class action which challenged on antitrust grounds the refusal by Xerox to sell parts to ISOs. *See R & D Bus. Sys. et al. v. Xerox Corp.,* No. 2–92–CV–042 (E.D.Tex.); Stat. of Lim. SOF ¶ 18. By 1993, Xerox controlled 93 per cent of the market for service of Xerox high speed copiers. *See id.* ¶ 141. As late as 1994, Xerox stated that the goal of its ISO strategy was to capture 100 per cent of the service market on Xerox equipment. *See id.* ¶ 35. In 1994, pursuant to a settlement of the *R & D* antitrust litigation, Xerox changed its parts policy. Since that time, it has permitted ISOs to purchase replacement parts and technical documentation for all Xerox copiers. *See id.* ¶ 19; Antitrust SOF ¶ 7.

CCS primarily serviced Xerox model 1065, 1075 and 1090 copiers. Xerox has patents on the fuser/heat rolls for these three copiers and the photoreceptor belts and dicorotrons for the 1075 and 1090 copiers. *See* Antitrust SOF ¶¶ 25–26. Ninety-nine per cent of the parts for these three copiers, however, are not patented. *See id.* ¶¶ 55–58. CCS has not established

that it suffered injury on account of its inability to obtain any specific part. *See id.* ¶¶ 28–30. Its expert, Dr. Jeffrey Mackie–Mason, testified that CCS was limited in its ability to grow and compete, but that the restrictions on the sale of Xerox patented parts were not the only factor. *See* Deposition of Dr. Jeffrey Mackie–Mason at 201, attached as Exhibit 14 to Consolidated Appendix—Volume II (Doc. # 776) filed June 2, 1999. Dr. Mackie–Mason noted that ISOs like CCS cannot compete in the service business unless they "have assured access to all of the parts necessary to keep" the copiers running. *See* Antitrust SOF ¶ 23; Mackie–Mason Report at 21.

CCS purchased parts from Xerox only when those parts were unavailable from all other known sources. *See* CCS Answers To Xerox Corporation's First Set Of Interrogatories at 5, attached as Exhibit 14 to *Xerox Corporation's Memorandum In Support Of Motion For Summary Judgment On Plaintiff's Antitrust Claims* (Doc. # 747) filed April 19, 1999. CCS relied on Xerox, however, for the vast majority of its parts. *See* Stat. of Lim. SOF ¶ 57. For example, "Xerox [was] the sole source for critical replacement parts for Xerox [high volume] copiers, including [patented] photoreceptor belts." Antitrust SOF ¶ 20; Expert Report of Dr. Jeffrey Mackie–Mason at 33, attached as Exhibit 14 to Consolidated Appendix—Volume II (Doc. # 776) filed June 2, 1999. On at least 55 occasions between February 1989 and October 1990, Cigna ordered patented photoreceptors, fuser rolls and dicorotrons from Xerox so that CCS could service copiers at Cigna offices. *See* Exhibit 1 to *Xerox Corporation's Reply Memorandum In Support Of Motion For Summary Judgment On Plaintiff's Antitrust Claims* (Doc. # 779) filed June 15, 1999. Dr. Mackie–Mason testified that CCS needed some access to Xerox manufactured photoreceptors. *See* Antitrust SOF ¶ 20. Spindel, the Xerox manager for service marketing, testified that photoreceptors are critical because they are "among the three

or four most frequently replaced parts" and in terms of dollars spent on parts used in servicing high volume copiers and printers, the cost of replacing photoreceptors is "the number one cost." *Id.* at 33 n. 101; *see* Antitrust SOF ¶ 18. For the average life of a model 1075 copier, photoreceptors are the number one cost of servicing, fuser rolls are the number two cost and dicorotrons are the number five cost. *See* Tab B to Dixon Declaration, attached as Exhibit 9 to Consolidated Appendix—Volume I (Doc. # 775) filed June 2, 1999 (based on replacement rate per million copies multiplied times Xerox cost). Xerox recognized that all sources of photoreceptors could ultimately be traced back to it through foreign Xerox subsidiaries, used Xerox machines, or theft by Xerox employees. *See* Mackie–Mason Report at 34. Dr. Mackie-Mason opined that none of these sources provided a sufficient supply of photoreceptors for ISOs. *See id.* at 34–35. Arnold Schwartz, a CCS employee from September 1992 through March 1994 who was responsible for ordering parts, testified that he had a major problem obtaining photoreceptors from sources other than Xerox, but that other parts were not a major problem. *See* Antitrust SOF ¶ 19.

On several occasions when CCS attempted to order parts in compliance with the Xerox verification procedure, Xerox delayed approval for two or three days, refused to supply the full quantity of parts requested, or refused to ship because CCS had previously ordered identical parts within a certain period. *See* Stat. of Lim. SOF ¶ 113. In addition, Xerox re-classified several 1090 parts as parts for a newer 5090 machine, and refused to sell them to 1090 users until Xerox approved the release of the part, which caused a two or three day delay. *See id.* ¶ 116.

### 2. *CCS And Xerox Customers*

In 1984, CCS began servicing approximately 25 Xerox copiers at Fairfield University. Initially, Fairfield was satisfied with CCS service and technicians. In 1989 and 1990, however, it experienced significant copier "down time" due to delays in shipment of Xerox parts. By 1993, Fairfield had terminated its relationship with CCS because Xerox restricted the sale of parts to CCS. *See* Stat. of Lim. SOF ¶ 117; State Claims SOF ¶ 58.

In 1989, Choate Rosemary Hall changed its service provider from Xerox to CCS. CCS initially had good response time but by 1990 copier "down time" was a serious problem with delays up to one week. Choate Rosemary Hall stopped using CCS because it could not get Xerox parts in a timely manner. *See* Stat. of Lim. SOF ¶ 118; State Claims SOF ¶ 59.

Richard Barnes, the assistant director for copy services at Cigna, testified that CCS prices were 18 per cent lower than Xerox repair costs for the 10 series equipment. In December 1988, CCS began a new Cigna contract in Philadelphia. On April 26, 1990, Xerox changed its verification procedures, forcing Cigna personnel to personally place all orders and prohibiting CCS technicians from placing orders on the Cigna account number. Barnes testified that the Xerox verification procedure caused a delay in emergency orders. *See* Stat. of Lim. SOF ¶ 119. Jim Blake, a former Xerox and CCS repair technician who worked on the Cigna–Philadelphia contract, testified that as a Xerox technician he kept a truck inventory of readily available parts but that Xerox prevented CCS from keeping an adequate inventory. Blake testified that when he serviced copiers for CCS, Xerox policies caused Cigna copiers to be down three to four times longer than when he worked for Xerox. *See id.* ¶ 120.

In March 1990, the Medical College of Pennsylvania canceled its contract with CCS because CCS could not timely obtain parts from Xerox and because of excessive copier down time. *See id.* ¶ 136.

### B. *Analysis*

### 1. *Parts Market Monopolization Claim*

 CCS alleges that Xerox unlawfully monopolized the market for parts used in

high speed copiers. *See Amended Complaint* (Doc. # 246) ¶ 86. To prevail under Section 2 of the Sherman Act, CCS must prove (1) that Xerox possessed monopoly power in the relevant market; (2) that Xerox willfully acquired or maintained that power through anticompetitive means "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident;" and (3) that as a result, CCS suffered antitrust injury. *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 480, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)).

■ For purposes of this motion, Xerox does not deny that it had monopoly power in the parts market. Rather, Xerox argues that CCS has not shown that it obtained or maintained such power through anticompetitive means. The Court agrees. CCS in fact concedes that its expert has not examined whether Xerox acquired or maintained by improper means its market share in the parts market. *See* Antitrust SOF ¶ 12.

CCS apparently argues that Xerox excluded competitors from the parts market by agreements with subsidiaries Rank Xerox and Xerox Canada that they would not supply parts to the United States. Xerox, however, is entitled to arrange its internal affairs so that it does not compete with itself. *See Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 769–71, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (operations of corporate enterprise organized into divisions judged as conduct of single actor for antitrust purposes, coordination between divisions permissible). CCS has not cited any authority, and the Court is not aware of any authority, that such agreements are subject to antitrust scrutiny.[8]

CCS also argues that Xerox unlawfully monopolized the parts market by charging supracompetitive prices. High prices alone, however, are insufficient to show that Xerox unlawfully acquired or maintained monopoly power. *See Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic,* 65 F.3d 1406, 1412–13 (7th Cir. 1995) (natural monopolist that acquired and maintained monopoly absent improper means may charge any price it wants; antitrust laws not price-control statute or public-utility or common-carrier rate-regulation statute), *cert. denied,* 516 U.S. 1184, 116 S.Ct. 1288, 134 L.Ed.2d 233 (1996). Indeed, high prices generally invite new competitors into the market. *See Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 274 n. 12 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).

In sum, the CCS evidence is legally insufficient to show that Xerox acquired or maintained its monopoly power in the parts market by improper means. The Court sustains the Xerox motion for summary judgment on this issue.[9]

---

8. CCS maintains that in 1990, the Canadian Competition Tribunal determined that Xerox improperly excluded competition in the parts market by its concerted refusal with its affiliates in Canada and Europe to sell parts to third party vendors. The Canadian Competition Tribunal decision is not relevant here, however, because it was based on Canadian law. *See* Order of Competition Tribunal dated Nov. 2, 1990, at 51 n.47 ("Unlike the Competition Act the concept of refusal to supply in both U.S. law and EEC law operates within the framework of provisions preventing abuse of dominant position or monopolization and tied selling and other vertical restraints."), attached as Exhibit 22 to CCS Consolidated Appendix. Moreover, the decision does not support the CCS claim of Xerox monopolization of the parts market. *See id.* at 80 (Xerox policies designed to eliminate competition in service market).

9. CCS also alleges that Xerox unlawfully monopolized the parts and service markets for Xerox printers. CCS, however, has never serviced or attempted to service Xerox printers. Furthermore, CCS has never attempted to buy parts for Xerox printers. *See* Antitrust SOF ¶ 16. Thus the Court sustains the Xerox motion for summary judgment with respect to this claim.

**2. Service Market Monopolization Claim**

CCS alleges that Xerox monopolized or attempted to monopolize the relevant market for service of Xerox high speed copiers. *See* Amended Complaint (Doc. # 246) ¶¶ 76–84. In particular, CCS claims that Xerox refused to sell copier parts to ISOs such as CCS, that Xerox defamed CCS, and that it instituted other anticompetitive policies to discourage end-users from contracting with ISOs.

**a. Xerox Refusal To Sell Patented Parts**

 Based on the Ninth Circuit reasoning in *Image Tech. Servs., Inc. v. Eastman Kodak Co. ("Kodak")*, 125 F.3d 1195 (9th Cir.1997), *cert. denied*, 523 U.S. 1094, 118 S.Ct. 1560, 140 L.Ed.2d 792 (1998), CCS claims that Xerox committed an antitrust violation when it refused to sell patented parts directly to ISOs. In *Kodak*, the Ninth Circuit noted that " 'while exclusionary conduct can include a monopolist's unilateral refusal to license a [patent or] copyright,' or to sell its patented or copyrighted work, a monopolist's 'desire to exclude others from its [protected] work is a presumptively valid business justification for any immediate harm to consumers.' " *Id.* at 1218 (quoting *Data General Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1187 (1st Cir.1994)). The Ninth Circuit therefore held that if Kodak asserted that "its desire to profit from its intellectual property rights justifie[d] its conduct," the jury should "presume that this justification is legitimately procompetitive." 125 F.3d at 1219. It noted, however, that the presumption could be rebutted by evidence that Kodak's refusal to deal was not truly based on a desire to protect its intellectual property rights. *Id.*

 In reliance on *In re Independent Serv. Orgs. Antitrust Litig. ("ISO Antitrust Litigation")*, 989 F.Supp. 1131, 1134–44 (D.Kan.1997), a case related to this action, Xerox seeks summary judg-

ment on this claim. Specifically, Xerox argues that it had no legal obligation to sell patented parts directly to ISOs and that as a matter of law its refusal to do so was not an actionable violation of antitrust law. *See ISO Antitrust Litig.*, MDL No. 1021, 1997 WL 450028, at *1–3 (D.Kan. July 17, 1997); *ISO Antitrust Litig.*, 964 F.Supp. 1479, 1487–90 (D.Kan.1997). In *ISO Antitrust Litigation*, the Honorable Earl E. O'Connor rejected the Ninth Circuit's reasoning in *Kodak* and held that where a patent or copyright has been lawfully acquired, subsequent conduct which is permissible under patent or copyright laws cannot give rise to liability under antitrust laws. For the reasons which Judge O'Connor so ably set forth, the Court in this case holds that where a patent has been lawfully acquired, subsequent conduct permissible under the patent laws cannot give rise to liability under the antitrust laws.[10] *See Miller Insituform, Inc. v. Insituform of North Am., Inc.*, 830 F.2d 606, 609 (6th Cir.1987), *cert. denied*, 484 U.S. 1064, 108 S.Ct. 1023, 98 L.Ed.2d 988 (1988); *United States v. Westinghouse Elec. Corp.*, 648 F.2d 642, 647 (9th Cir.1981); *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1206 (2d Cir.1981), *cert. denied*, 455 U.S. 1016, 102 S.Ct. 1708, 72 L.Ed.2d 132 (1982); *see also Data General*, 36 F.3d at 1185–87; 3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 704.1, at 189 (Supp.1999) (Judge O'Connor's conclusion "seems indisputably correct, and appears to be compelled by the explicit language of the Patent Act").

 The Court incorporates by reference the reasoning of Judge O'Connor in *ISO Antitrust Litigation*, 989 F.Supp. at 1134–44; *ISO Antitrust Litig.*, 1997 WL 450028, at *1–3; and *ISO Antitrust Litig.*, 964 F.Supp. at 1487–90. In particular, the Court agrees that a single patent may implicate multiple antitrust markets. *See ISO Antitrust Litig.*, 989 F.Supp. at 1137

---

**10.** In their briefs on the CCS antitrust claims, neither party addresses whether the refusal to license or sell copyrighted materials would violate antitrust law. Thus the Court does not address that issue.

(citing *Miller Insituform,* 830 F.2d at 609 and *Servicetrends, Inc. v. Siemens Med. Sys., Inc.,* 870 F.Supp. 1042, 1056 (N.D.Ga. 1994), *amended on reconsideration,* 1994 WL 776878 (N.D.Ga. Jun.24, 1994)). A patentee may unilaterally exclude others from using its invention even if such conduct allows the patentee to obtain monopolies in multiple markets. The patentee's economic success is the reward for its invention. *See, e.g., King Instruments Corp. v. Perego,* 65 F.3d 941, 950 (Fed.Cir.1995) (Patent Act creates incentive for innovation and upon grant of patent, only limitation on patentee's economic reward during period of exclusivity should be dictated by marketplace), *cert. denied,* 517 U.S. 1188, 116 S.Ct. 1675, 134 L.Ed.2d 778 (1996); *United States v. Studiengesellschaft Kohle, m.b.H.,* 670 F.2d 1122, 1129 (D.C.Cir.1981) (patent gives holder unlimited right to exclude others from utilizing its process). Except for the Ninth Circuit decision in *Kodak,* the Court is not aware of any authority which attempts to restrict the inherent rights embodied in the patent grant when the patent holder achieves too much success. *See ISO Antitrust Litig.,* 989 F.Supp. at 1138; *see also SCM,* 645 F.2d at 1206 (patent holder can continue to exercise patent's exclusionary power even after achieving commercial success; to allow imposition of treble damages based on what reviewing court might later consider "too much" success would seriously threaten integrity of patent system).

CCS claims that by refusing to sell patented parts, Xerox "leveraged" its monopoly power in the parts market to obtain a monopoly in the service market. The leveraging theory starts with the flawed premise that Xerox may refuse to sell patented parts only in the parts market. Such a premise would negate the express rights which Xerox possesses in the patent grant and, contrary to established law, grant its competitor in the service market the right to decide what antitrust market Xerox may monopolize. *See King Instruments,* 65 F.3d at 950 (court should not presume to determine how patentee should maximize its reward for investing in innovation). CCS does not explain as a practical matter how Xerox could exercise its right to exclude competitors in the parts market while simultaneously selling patented parts to competitors in the service market. Also, the rule which CCS proposes would significantly reduce the incentives otherwise provided by the Patent Act. *See, e.g., Chisholm–Ryder Co., Inc. v. Mecca Bros., Inc.,* 217 U.S.P.Q. 1322, 1338, 1982 WL 1950 (W.D.N.Y.1982), *aff'd,* 746 F.2d 1489 (Fed.Cir.1984) ("One would have to be suffering from 'unthinking monopolophobia' to deny [a patent holder] the right, given to it as the quid pro quo—its right to exclude in exchange for its disclosure to the public of these inventions—to monopolize the field covered by its patents to the exclusion of all others."); *W.L. Gore & Assocs., Inc. v. Carlisle Corp.,* 529 F.2d 614, 623 (3d Cir.1976) (right to refuse to license is essence of patent holder's right; patent law rewards invention disclosure by grant of limited monopoly in exploitation of the invention).

The Court's holding on this issue is supported in part by the recent decision in *Intergraph Corp. v. Intel Corp.,* 195 F.3d 1346 (Fed.Cir.1999). There, the Federal Circuit stated that generally, unilateral conduct which is permitted under patent and copyright laws is not subject to antitrust scrutiny. *See id.* at 1362–63. It noted:

> [T]he antitrust laws do not negate the patentee's right to exclude others from patent property....

> In *Image Technical Services* the Ninth Circuit reported that it had found "no reported case in which a court had imposed antitrust liability for a unilateral refusal to sell or license a patent or copyright." 125 F.3d at 1216. Nor have we. In accord is the joint statement of the United States Department of Justice and Federal Trade Comm'n, Antitrust Guidelines for the Licensing of Intellectual Property 4 (1995) that market power does not "impose on the intellectual property owner an obligation to

license the use of that property to others." *Id.* at 4. *See* 35 U.S.C. § 271(d)(4) ("No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: ... (4) refused to license or use any rights to the patent"). *See also, e.g., Miller Insituform, Inc. v. Insituform of North Am., Inc.,* 830 F.2d 606, 609 (6th Cir.1987) ("A patent holder who lawfully acquires a patent cannot be held liable under section 2 of the Sherman Act for maintaining the [market] power he lawfully acquired by refusing to license the patent to others."); *United States v. Westinghouse Electric Corp.,* 648 F.2d 642, 647–48 (9th Cir. 1981) (patent holder has the "untrammeled" right to license or not, exclusively or otherwise); *SCM Corp. v. Xerox Corp.,* 645 F.2d 1195, 1206–07 (2d Cir. 1981).

*Intergraph,* 195 F.3d at 1362–63. Moreover, although it did not discuss the issue in detail, the Federal Circuit recognized the difference between the scope of a patent grant and the scope of the relevant antitrust markets—a key distinction which Judge O'Connor had previously noted. *See id.* at 1355 ("patent grant is a legal right to exclude, not a commercial product in a competitive market"); *ISO Antitrust Litig.,* 989 F.Supp. at 1134–39.

Finally, in *Intergraph,* the Federal Circuit noted:

> The antitrust law has consistently recognized that a producer's advantageous or dominant market position based on superiority of a commercial product and ensuing market demand is not the illegal use of monopoly power prohibited by the Sherman Act. In *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 596 n. 19, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) the Court explained that "[t]he offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident," quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 570–571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Product superiority and the ensuing market position, flowing from a company's research, talents, commercial efforts, and financial commitments, do not convert the successful enterprise into an illegal monopolist under the Sherman Act.

*Id.* at 1353–54; *see id.* at 1360 (integrated business does not offend Sherman Act by drawing on competitive advantages of efficiency, experience, or reduced transaction costs, in entering new fields or downstream markets; such advantages are not uses of monopoly power). Likewise, Judge O'Connor previously held that Xerox could lawfully exercise its power to exclude competitors in the service market from using its patented products because such power arises from its patents, *i.e.* its technical innovation and financial commitments. *See ISO Antitrust Litig.,* 989 F.Supp. at 1134–39.

For these reasons, the Court concludes that Xerox did not commit an antitrust violation when it unilaterally refused to sell patented parts to CCS.

### b. Disaggregation Of Damages

■ Xerox argues that it is entitled to summary judgment on the service market monopolization claim because CCS has not disaggregated those damages which are attributable to a lawful refusal to sell patented parts. CCS has the initial burden to show that its injuries are due to unlawful anticompetitive conduct. *See Amerinet,* 972 F.2d at 1494; *MCI Communications Corp. v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1161 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); 15 U.S.C. § 15. This burden includes the duty to disaggregate damages which are attributable to lawful conduct

such as a refusal to sell patented parts. After plaintiff has met this initial burden, it may invoke a more lenient standard of proof for the precise amount of damages. *See Amerinet,* 972 F.2d at 1494. The Supreme Court has explained:

[T]here is a clear distinction between the measure of the proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.

*Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *see MCI,* 708 F.2d at 1161 (after causation established, amount of damages determined by just and reasonable estimate). If plaintiff attributes all of its losses to illegal acts, despite other significant factors, "the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage." *MCI,* 708 F.2d at 1162 (citing *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946)); *see also National Ass'n of Review Appraisers & Mortg. Underwriters, Inc. v. Appraisal Found.,* 64 F.3d 1130, 1135 (8th Cir.1995) (plaintiff may not recover losses due to factors other than defendant's anticompetitive violations) (citing *Amerinet,* 972 F.2d at 1494), *cert. denied,* 517 U.S. 1189, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996). To meet its burden to disaggregate, plaintiff must provide the fact finder a reasonable basis upon which to estimate the amount of losses caused by lawful factors. *See United States Football League v. National Football League,* 842 F.2d 1335, 1378–79 (2d Cir.1988); *MCI,* 708 F.2d at 1161.

Xerox correctly notes that CCS has failed to offer any facts from which a jury might estimate the amount of losses due to its lawful refusal to sell patented parts. CCS responds that as the wrongdoer, Xe-

rox must bear the risk of any uncertainty which its wrongdoing has created. *See Response by Plaintiff Creative Copier Service To Xerox Motion For Summary Judgment On Plaintiff's Antitrust Claims* (Doc. # 772) filed June 2, 1999 at 59–61 (citing *Bigelow,* 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652). This principle applies only after plaintiff has offered proof of injury to its business and profits due to wrongful conduct by defendant which is not attributable to other causes. *See id.* at 264, 66 S.Ct. 574; *United States Football League,* 842 F.2d at 1378–79; *MCI,* 708 F.2d at 1161. Moreover, CCS has not shown that conduct by Xerox made it impossible to disaggregate damages.

CCS also argues that an antitrust violation need only be a substantial factor (not the sole cause) of its injury, but it has not shown that any antitrust violation by Xerox has been a substantial cause of its injury. CCS alleges that Xerox caused injury by refusing to sell both patented and unpatented parts, but it never attempts to distinguish injury caused by a *lawful* refusal to sell *patented* parts and injury caused by an *un*lawful refusal to sell *un*patented parts. *See* Antitrust SOF ¶¶ 28–30; Mackie–Mason Depo. at 172 ("I don't know whether they were patented or unpatented parts that failed that led to customer dissatisfaction."); Cunitz Expert Report (attributing damages to "parts" availability problems); Dixon Depo. at 281–82, 350, 433–34, 449, 451 (unable to identify specific parts which caused lost business).

CCS apparently asks the Court to assume that because unpatented parts represent approximately 99 per cent of the parts for the 1065, 1075 and 1090 model copiers, a refusal to sell unpatented parts was a substantial cause of its injury. CCS has not referenced any record evidence for this assumption and indeed, the record evidence suggests that such an assumption is inappropriate. First, CCS expert Dr. Mackie–Mason emphasized in his report that "Xerox is the sole source for critical replacement parts for Xerox [high volume] copiers, including [patented] photoreceptor

belts." He also emphasized that CCS needed access to Xerox manufactured photoreceptors, *see* Antitrust SOF ¶ 20; Mackie–Mason Report at 33, and that ISOs could not obtain a sufficient supply of such photoreceptors from sources other than Xerox. *See id.* at 34–35; *see also* Antitrust SOF ¶ 19 (testimony of Arnold Schwartz). Dr. Mackie–Mason further noted that photoreceptors are critical because they are "among the three or four most frequently replaced parts" and that in terms of dollars spent on parts used in servicing high volume copiers and printers, the cost of replacing photoreceptors is "the number one cost."[11] Id. at 33 n. 101. In fact, for the average life of a model 1075 copier, photoreceptors were the number one cost of servicing, fuser rolls were the number two cost and dicotrons were the number five cost. *See* Tab B to Dixon Declaration. Moreover, CCS concedes that it purchased patented parts from Xerox because such parts were unavailable from other sources and that it depended on Xerox to supply the vast majority of its parts. *See* Stat. of Lim. SOF ¶ 57. For example, on at least 55 occasions between February 1989 and October 1990, CCS ordered patented photoreceptors, fuser rolls and dicorotrons from Xerox to service Cigna copiers.[12] See Exhibit 1 to *Xerox Corporation's Reply Memorandum In Support Of Motion For Summary Judgment On Plaintiff's Antitrust Claims* (Doc. # 779) filed June 15, 1999. Finally, Dr. Mackie–Mason testified that Xerox restrictions on patented parts limited the ability of CCS to compete and grow, *even though those restrictions were not the only factor.* *See* Deposition of Dr. Jeffrey Mackie–Mason at 201, attached as Exhibit 14 to Consolidated Appendix—Volume II (Doc. # 776) filed June 2, 1999. Given that Xerox restrictions on patented parts impacted CCS to a measurable degree, CCS must show what portion of its alleged injury is attributable to such lawful conduct. *See Amerinet,* 972 F.2d at 1495–96 (plaintiff must provide reasonable basis to exclude damages caused at least partly by factors other than Xerox antitrust violations). CCS has not attempted to meet this evidentiary burden.

11. CCS asks the Court to strike the Declaration of John Jandrokovic, which is attached as Exhibit 2 to *Xerox Corporation's Reply Memorandum In Support Of Its Motion For Summary Judgment On Plaintiff's Antitrust Claims* (Doc. # 779) filed June 15, 1999. *See Motion By Creative Copier Service To Deem Admitted Matters Pursuant To Local Rule 56.1 And The Order Of April 21, 1999, And To Strike Matters From Xerox Reply Memoranda* (Doc. # 784) filed June 28, 1999. In his declaration, Jandrokovic emphasizes the importance of patented photoreceptors, fuser rolls and dicorotrons in the service of 1075 and 1090 model copiers. He states that these three patented parts account for approximately 14 per cent of all parts used to service the copiers and approximately 30 per cent of the total cost of servicing the copiers. CCS objects to the declaration because Jandrokovic has never been identified as a witness, he does not specifically identify the data on which he bases his declaration, he does not identify the procedure by which the data was collected, and he does not explain how or why the same information would apply to CCS. Xerox has not demonstrated that it identified Jandrokovic prior to its reply brief in this case. Moreover, the declaration should have been submitted with Xerox's motion for summary judgment to establish that patented parts are a significant factor in estimating CCS damages. The declaration also does not address many key issues such as the time period involved and how the Xerox information can be extrapolated to CCS. For these reasons, the Court will strike the declaration. Although the Court strikes the declaration, the Court notes that other record evidence (including the expert report of Mackie–Mason) establishes the importance of CCS access to Xerox manufactured patented parts such as photoreceptors.

12. Xerox submitted these invoices as Exhibit 1 to *Xerox Corporation's Reply Memorandum in Support Of Its Motion For Summary Judgment On Plaintiff's Antitrust Claims* (Doc. # 779) filed June 15, 1999. CCS asks the Court to consider the invoices as samples, and not as a representation of its overall purchase patterns. *See Memorandum In Support Of Motion By Creative Copier Service To Deem Admitted Matters Pursuant To Local Rule 56.1 And The Order Of April 21, 1999, And To Strike Matters From Xerox Reply Memoranda* (Doc. # 784) filed June 28, 1999. Even as samples, however, the invoices illustrate that CCS relied in part on Xerox to provide patented parts.

Relying on Dixon's declaration, CCS claims that it could have survived without access to patented parts. Dixon states:

62. If Xerox had imposed its parts restriction procedures, but limited it to its few "patented parts" such as photoreceptor belts, heat rollers, and/or dicorotrons, I believe CCS could have worked around those restrictions in a combination of ways, as follows:

First, in my opinion, it might have been possible to convince most of our customers to order those parts, and we could have built up an inventory supply at more customers' locations. The photoreceptor belts, heat rollers, and dicorotrons have a fairly predictable wear life. To have obtained and stocked sufficient inventories for those at customer's location would not have been an insurmountable problem;

Second, as Mr. Bethea said in his deposition, photoreceptor belts, heat rollers, and dicorotrons were items carried by third party supply houses. I have attached as Exhibit D some sample invoices to demonstrate this. (These are merely representative). In addition, heat rollers and dicorotrons could both be repaired. For heat rollers, you sent the "core" (the metal tube) back to the supply house, and it recoated the roller. D & R Products repaired dicorotrons, by replacing the center wire (which is enclosed in glass). That is the only part of the dicorotron that usually needed repair. The problem was not in obtaining the above parts, but rather obtaining all of the other parts we needed to repair the machines on an emergency basis, which were available only from Xerox;

Therefore, if Xerox had restricted only photoreceptor belts, heat rollers and dicorotrons, and if Xerox had shipped all of the other parts without the "on site verification procedure," by using a combination of customer ordering and third party suppliers we could have continued to meet our customers' up time requirements.

If Xerox had not imposed its "end user" restrictions on its 99.9% of unpatented parts, and made them freely available to us, we could have built up a "car stock" for each of our technicians, similar to the ones that Xerox had, which would have benefitted our customers by allowing us to service our customers' machines faster. 98% of the parts in the 1075 TRIC (Exhibit B) are not claimed by Xerox to be patented;

If only the photoreceptor and one or two other parts had been restricted, there might have been more pressure in the marketplace to develop substitute sources for these. For example, at some point around 1992, a company figured out how to cut and configure the Kodak "blue belt" photoreceptor material so that it would work in a Xerox 1075/1090 machine, and a supply of these became available. This might have happened several years earlier;

63. If Xerox had only restricted its handful of "patented" parts, we could have worked around this.

Declaration of William Dixon ¶¶ 62–63, attached as Exhibit 9 to Consolidated Appendix -Volume I (Doc. # 775).

 Xerox argues that Dixon's declaration should be stricken because it directly conflicts with a prior interrogatory answer by CCS.[13] The Court will disregard

13. Xerox requested CCS to identify each part (by name and number) for Xerox copiers that CCS alleged that it was not able to obtain from any source other than Xerox. *See* Xerox Corporation's First Set Of Interrogatories at 5, attached as Exhibit 14 to *Xerox Corporation's Memorandum In Support Of Motion For Summary Judgment On Plaintiff's Antitrust Claims* (Doc. # 747) filed April 19, 1999. CCS responded that it purchased parts from Xerox only when those parts were unavailable from all other known sources. *See id.* CCS also referred Xerox to a number of invoices which indicate that CCS purchased parts from Xerox. In fact, on at least 55 occasions between February 1989 and October 1990, Cigna ordered patented photoreceptors, fuser rolls and dicorotrons from Xerox so that CCS could service copiers at Cigna offices. *See*

declarations which are inconsistent with prior sworn testimony if the changes attempt to create a sham fact issue. *See Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir.1986). "[T]he utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony." *Id.* Prior discovery responses made under oath essentially are prior sworn testimony and should be analyzed in the same manner as prior deposition testimony. *See, e.g., Donohoe v. Consolidated Operating & Prod. Corp.,* 982 F.2d 1130, 1136 n. 4 (7th Cir.1992); *Reisner v. General Motors Corp.,* 671 F.2d 91, 93 (2d Cir.1982). To determine if a declaration is an attempt to create a sham issue of fact, the Court must consider "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Franks,* 796 F.2d at 1237. The Court finds that the declaration does not directly contradict the prior interrogatory answer by CCS and that it therefore should not be stricken under *Franks v. Nimmo.*

Even though the declaration will not be stricken, it is insufficient to avoid summary judgment by creating a genuine issue of material fact whether CCS could have survived without access to patented parts and that its damages arose from the refusal to sell *un* patented parts. At best the Dixon declaration reflects speculation that *if* Xerox had limited its parts restriction to patented parts and *if* Xerox had shipped all other parts without on site verification, CCS could have worked around the restrictions by cajoling "most" of its customers to stockpile spare parts and/or use third party suppliers. The declaration does not affirmatively demonstrate that Dixon has personal knowledge or is competent to distinguish the impact of Xerox restrictions on patented and unpatented parts. *See* Fed.R.Civ.P. 56(e). Also, statements that CCS could "work around" restrictions on patented parts do not purport to negate Dr. Mackie–Mason's testimony that Xerox restrictions on patented parts caused injury to CCS.[14] Finally, Dixon's conjecture does not provide a reasonable and principled basis for excluding damages attributable to lawful conduct. *See Bigelow,* 327 U.S. at 264, 66 S.Ct. 574; *MCI,* 708 F.2d at 1162. Thus the Court finds that the Dixon declaration is insufficient to establish that CCS sustained damages on account of the Xerox refusal to sell unpatented parts.

CCS apparently argues that even if it improperly failed to disaggregate damages, the remedy is not to grant summary judgment for Xerox but to give CCS experts a chance to revise their damage calculations. *See CCS Opposition Brief* (Doc.

Exhibit 1 to *Xerox Corporation's Reply Memorandum In Support Of Motion For Summary Judgment On Plaintiff's Antitrust Claims* (Doc. # 779) filed June 15, 1999.

14. Mackie–Mason takes the position that Xerox restrictions on the sale of patented parts caused injury to CCS, while Dixon claims that "[t]he problem was not in obtaining the above [patented] parts, but rather obtaining all of the other parts we needed to repair the machines on an emergency basis, which were available only from Xerox." To the extent that these claims are in conflict, Dixon's declaration does not explain why, if photoreceptor belts, heat rollers and dicorotrons were available from third party supply houses and

heat rollers and dicorotrons could be repaired, CCS could not satisfy its demand for patented Xerox products from such sources. Nor does he purport to answer the obvious question why, if a restriction on the sale of *un* patented parts was the problem, the marketplace did not respond by developing substitute sources for such parts as when "a company figured out how to cut and configure the Kodak 'blue belt' photoreceptor material so that it would work in a Xerox 1075/1090 machine, and a supply of these became available." On this record, the Court finds that no reasonable fact finder would conclude from Dixon's testimony that "[i]f Xerox had only restricted its handful of 'patented' parts, [CCS] could have worked around this."

#772) filed June 2, 1999 at 64. CCS essentially asks the Court to delay ruling on the summary judgment motion so it can get new damage calculations. The Court construes this argument as an insufficient motion under Rule 56(f), which allows a party to submit an affidavit "that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition" and permits the Court to order a continuance to permit further discovery. *See id.* The Court has discretion whether to grant a motion under Rule 56(f). *See Jensen v. Redevelopment Agency*, 998 F.2d 1550, 1553–54 (10th Cir.1993). The rule is not "invoked by the mere assertion that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavailable." *Pasternak v. Lear Petro. Explor., Inc.*, 790 F.2d 828, 833 (10th Cir.1986). CCS must state with specificity how the additional time would enable it to obtain evidence to oppose the motion for summary judgment. *See Jensen*, 998 F.2d at 1554.

CCS has not offered a proper supporting affidavit in compliance with Rule 56(f). Also, since at least April of 1997, CCS has been on notice that the case involved a critical distinction between damages attributable to the refusal to sell patented, as opposed to unpatented, parts. In April 1997, Judge O'Connor ruled in a companion case that the refusal to sell patented parts did not constitute an antitrust violation. *See ISO Antitrust Litig.*, 964 F.Supp. at 1487–90. Judge O'Connor reaffirmed that ruling in July and December of 1997. *See ISO Antitrust Litig.*, 1997 WL 450028, at *1–3 (July 17, 1997); *ISO Antitrust Litig.*, 989 F.Supp. at 1134–44 (Dec. 22, 1997). CCS should have requested leave to amend its expert reports to di-

saggregate damages long before June 1999, when it opposed the Xerox motion for summary judgment.[15]

c. Defamation

■■■ CCS next claims that Xerox defamed it, in violation of antitrust law. In light of the foregoing discussion, the one remaining state law defamation claim is that Xerox defamed CCS by telling Aetna that CCS technicians would not obtain any training. *See supra* text, part I. B.[16] This statement is legally insufficient to establish an antitrust violation. The Honorable John W. Lungstrum of this court recently held:

> The allegations in plaintiff's complaint, taken as true, establish that defendant contacted plaintiff's customers and vendors, defamed plaintiff, used plaintiff's trade secrets and proprietary information, marketed products in competition with plaintiff, and set prices barely above plaintiff's costs for the products. The logical and stated result of such conduct is plaintiff's inability to compete further in the market. Such injury is not an antitrust injury, however, because it does not affect competition in the market generally.

*Bushnell Corp. v. ITT Corp.*, 973 F.Supp. 1276, 1284–85 (D.Kan.1997). Likewise, other courts have held that disparaging comments by competitors are presumptively *de minimis* for antitrust purposes. *See American Prof. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof. Publications, Inc.*, 108 F.3d 1147, 1151–52 (9th Cir.1997); *National Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir.1988) (citing 3 P. Areeda & D. Turner, Antitrust Law ¶ 738a, at 278–79 (1978)); *David L. Aldridge Co. v. Micro-*

---

**15.** The Court need not consider the "impossibility" exception to the disaggregation rule. *See, e.g., Spray–Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1243 (7th Cir.1992), *aff'd*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *Litton Sys., Inc. v. Honeywell, Inc.*, 1996 WL 634213, at *2 (C.D.Cal. July 24, 1996). CCS has not asserted that its experts could not disaggregate damages, only that they are not required to do so. Indeed, CCS

expert Mackie–Mason testified that in his view, the impact of CCS' inability to obtain solely unpatented parts could be measured. *See* Mackie–Mason Depo. at 197–98.

**16.** The Court sustained the Xerox motion for summary judgment on plaintiff's other state law defamation claims. *See supra* text, part I. B.

*soft Corp.,* 995 F.Supp. 728, 749 (S.D.Tex. 1998). Plaintiff may overcome the presumption "by cumulative proof that the representations were [1] clearly false, [2] clearly material, [3] clearly likely to induce reasonable reliance, [4] made to buyers without knowledge of the subject matter, [5] continued for prolonged periods, and [6] not readily susceptible of neutralization or other offset by rivals." *Ayerst Labs.,* 850 F.2d at 916 (quoting Areeda & Turner ¶ 738a at 279). CCS has not presented such proof.

Based on *DXS Inc. v. Siemens Med. Sys., Inc.,* 100 F.3d 462 (6th Cir.1996), CCS argues that the Court should recognize its antitrust claim based on Xerox disparagement. In *DXS,* a medical equipment ISO claimed that disparagement by a manufacturer violated antitrust law. *See id.* at 465–66. On appeal, the Sixth Circuit addressed whether defendant's statements constituted a continuing antitrust violation for statute of limitations purposes. *See id.* at 466–68. The court did not address the issue presented here, *i.e.* whether the Xerox statement constitutes an antitrust violation in the first instance.

Relying on *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), CCS claims that disparagement is only one part of the evidence of antitrust violations by Xerox and that the Court must look at the factual proof as a whole. Although the Court must give CCS the full benefit of its proof without tightly compartmentalizing the various factual components, *see id.* at 699, 82 S.Ct. 1404, it must also analyze the factual support for each legal theory. *See Intergraph,* 195 F.3d at 1366–67. The Court does not add up the degrees of support for each legal theory. *See id.* To

survive summary judgment, CCS must establish that the factual support for a particular legal theory is sufficient to establish an antitrust violation. For reasons stated above, CCS has failed to meet its burden with respect to its antitrust claim based on Xerox disparagement.[17]

### d. Other Alleged Anticompetitive Conduct

 CCS alleges that Xerox monopolized or attempted to monopolize the relevant service markets by (1) offering discounts to customers who obtained (or were considering) service from ISOs; (2) refusing to provide service on a time and materials basis to ISO customers; and (3) using "Inspection and Restoration Policies" under which Xerox imposed substantial charges on end users who moved from ISO service to Xerox service. *See* Amended Complaint ¶ 50. Xerox argues that it is entitled to summary judgment because CCS has not shown injury from these policies, and the Court agrees. In opposing the motion for summary judgment, CCS fails to offer any evidence of injury. *See* Antitrust SOF ¶¶ 40–44. Accordingly, the Court must grant Xerox summary judgment on these claims.

CCS maintains that even if it cannot prove injury from the policies, such policies are relevant to show that Xerox had monopoly power and that Xerox misused that power. Given that CCS has not established an antitrust injury due to the refusal to sell Xerox parts or disparagement by Xerox, CCS cannot recover under any of the theories identified in this section.

In sum, the Court grants Xerox summary judgment on plaintiff's antitrust claims.[18]

**17.** The Court also notes that CCS has an independent remedy for this conduct under state law.

**18.** Given that the Court sustains the Xerox motion for summary judgment on plaintiff's antitrust claims on the above grounds, it need not reach the issues of plaintiff's alleged failure to mitigate its damages or the timeliness of plaintiff's antitrust claims. *See Xerox Cor-*

*poration's Memorandum in Support Of Motion For Summary Judgment On Plaintiff's Antitrust Claims* (Doc. # 747) filed April 19, 1999, at 31–34; *Xerox Corporation's Motion For Summary Judgment On Plaintiff's Antitrust Claims Barred By The Statute Of Limitations* (Doc. # 742) filed April 19, 1999.

## III. Xerox's Patent Infringement Counterclaim

### A. *Factual Background*

For purposes of the Xerox motion for summary judgment and the CCS cross motion for summary judgment on the patent infringement counterclaim by Xerox, the following facts are uncontroverted or deemed admitted.

Xerox alleges that CCS infringed its patents for various copier parts. *See Defendant And Counterclaim Plaintiff Xerox Corporation's Answer And Counterclaims To The First Amended Complaint Of Creative Copier Services* (Doc. # 258) filed March 26, 1996 at ¶¶ 10–21. Xerox seeks summary judgment on its patent infringement counterclaim with respect to three patents: U.S. Patent Nos. 4,258,258 ("the '258 patent"); 4,373,239 ("the '239 patent"); and 4,585,322 ("the '322 patent"). CCS requests summary judgment on these same claims.

#### 1. *'239 Patent*

The '239 patent relates to a specific polymer rubber coating on a fuser heat roll, a device that helps bond toner to paper. Claim 1 of the patent requires a thermally conductive fuser member for use in an electrographic copying machine comprising:

> (1) a relatively rigid base and
> (2) a thin layer of a composition coated on said base, said composition comprising the crosslinked product of a mixture of about 100 parts by weight of alpha, omega-hydroxypolydimethylsiloxane,
> about 128 to 250 parts by weight of finely divided tabular alumina, about 13 to 60 parts by weight of finely divided iron oxide particles, a sufficient amount of a crosslinking agent, and an effective amount of a crosslinking catalyst.

Xerox claims that CCS infringed the '239 patent when it used fuser heat rolls which it purchased from D & R Products, OEM Supplyco, Inc. and Graphic Associates. Dr. James E. Mark, an expert for Xerox, tested three fuser heat rolls which the parties identified in discovery as DX 12, DX 28 and DX 38. CCS did not make, use or sell DX 12, DX 28 and DX 38 in its business, but Xerox claims that these specimens represent infringing products which CCS *did* use or sell in its business. The record reveals the following information about DX 12, DX 28 and DX 38:

**DX 12:** Between July 1994 and February 1995, CCS purchased from OEM Supplyco some 13 heat rolls which carried part number 22S5356. On or about December 20, 1995, in response to a subpoena in which Xerox requested a 1075/1090 heat roll with part number 22S5356, Xerox obtained DX 12 from OEM Supplyco.

**DX 28:** During 1994 and 1995, CCS purchased from D & R Products fuser heat rolls which D & R Products identified as "22S5356 Fuser Roll[s]." Bill Beck, who worked at a copy center in Glendale, Arizona, purchased DX 28 from D & R Products on an unknown date. Xerox obtained DX 28, which the box identifies as a "Fuser Roll 22S5356," from Beck.

**DX 38:** During 1994 and 1995, CCS purchased from Graphic Associates fuser heat rolls which Graphic Associates identified as part number 22S5356X, "Roll New OEM Xerox." On January 26, 1996, Xerox requested that CCS produce certain copier parts for each non-Xerox source or vendor which was in CCS possession, custody or control. *See* Xerox's Second Request For Production From CCS dated Jan. 26, 1996 at 4, attached as Exh. A to *Memorandum Of Points And Authorities In Support Of Xerox Corporation's Motion For Summary Judgment On Patent Infringement* (Doc. # 735) filed March 19, 1999. Xerox had asked that each part be "in the identical condition it was received from the source/vendor." *Id.* Xerox also stated that it would reimburse CCS for the purchase cost as well as shipping and handling for each part produced. *See id.* In response to the request, CCS offered to order parts, have them shipped to CCS, and ship them directly

to counsel for Xerox.[19] See Exh. B. to *Memorandum Of Points And Authorities In Support Of Xerox Corporation's Motion For Summary Judgment On Patent Infringement* (Doc. # 735) filed March 19, 1999. Xerox apparently agreed to the CCS proposal and CCS consequently obtained DX 38 from Graphic Associates and forwarded it to Xerox.

Dr. Mark found that DX 12, DX 28 and DX 38 included rigid bases as described in Claim 1 of the '239 patent. He also found the following relative amounts of siloxane, alumina and iron oxide:

| | Parts By Weight Iron Oxide For Every 100 Parts By Weight Of Siloxane | Parts By Weight Tabular Alumina For Every 100 Parts By Weight Of Siloxane |
|---|---|---|
| Claimed Range ('239 patent) | about 13 to 60 | about 128 to 250 |
| DX 12 (from OEM Supplyco) | 17 | 297 |
| DX 28 (from D & R Products) | 25 | 213 |
| DX 38 (from Graphic Assocs.) | 15 | 101 |

### 2. '322 And '258 Patents

The '322 and '258 patents relate to a dicorotron, which is a device used in the 1075/1090 family of Xerox copiers. A dicorotron is a thin oblong metal box, about 24 inches long, with a thin wire that runs the length of the box. A high voltage of electricity runs through the wire, creating an electrostatic charge. This charge makes the toner (ink) adhere to the copy drum and copy paper. The '322 patent relates to a metal silicate (or "dag") coating on a dicorotron. Claim 1 of the '322 patent requires a corona generating device comprising:

(1) at least one elongated conductive corno discharge electrode supported between insulating end blocks,

(2) means to connect said electrode to a corona generating potential source and

(3) at least one element adjacent said corno discharge electrode capable of adsorbing nitrogen oxide species generated when said corona discharge electrode is energized and capable of desorbing nitrogen oxide species when said electrode is not energized, said at least one element being coated with a substantially continuous thin dehydrated alkaline film of an alkali metal silicate to neutralize the nitrogen oxide species when generated.

The item described in the '322 patent generally is referred to as a "dag style" or "dag coated" dicorotron.

The '258 patent relates to a particular mechanical configuration of a dicorotron. Claim 1 of the '258 patent requires a corona generating device for use with high applied voltages comprising:

(1) a coronode supported between a pair of endblock assemblies, each endblock assembly defining a space for the passage of said coronode from exterior said assembly to the other endblock assembly, and

(2) non-conductive inserts removably mounted in said spaces and surrounding said coronode, said inserts being made of a material with high dielectric strength and resistence to corrosive atmosphere to protect said assemblies from the effects of said high applied voltages, and said inserts being separately replaceable from the remainder of said corona generating device when said inserts have been eroded by the effects of said high applied voltages.

19. CCS also noted that only parts used in 1075 and 1090 copiers were "relevant to Creative Copier's current (from November 1994 to the present) copier servicing contracts." *Id.*

Xerox alleges that CCS infringed the '322 and '258 patents when it used dicorotrons which it purchased from D & R Products. With respect to the '322 patent, Robert W. Gundlach, an expert for Xerox, examined a D & R Products "dag style" dicorotron identified as DX 32. CCS did not make, use or sell DX 32 in its business. As with DX 28, counsel for Xerox obtained DX 32 from Beck, who had obtained it from D & R Products on an unknown date. Between September 1995 and November 1995, CCS purchased six dag style dicorotrons from D & R Products. All six, and the dicorotron which Gundlach tested, have the same part number: 125K1081.

With respect to the '258 patent, Gundlach also examined a non-dag coated dicorotron which Xerox obtained from D & R Products on an unknown date. During 1994 and 1995, CCS purchased non-dag dicorotrons from D & R Products for use in its business.

### 3. *Dr. Garvin's Declaration*

In opposing the Xerox motion for summary judgment, CCS included the declaration of Dr. Donald Garvin. Dr. Garvin attempted to rebut Dr. Mark's testimony regarding his testing methodology. Xerox has filed a motion to strike Dr. Garvin's declaration. Xerox first argues that the declaration is untimely. The Court's scheduling order provided that all expert reports for parties bearing the burden of proof (Xerox as to its patent infringement counterclaim) had to be served by October 31, 1996. *See Third Amended Scheduling Order* (Doc. # 339) at 1. Xerox timely served its expert reports (including Dr. Mark's report) on patent infringement. The scheduling order also provided that expert reports for parties contesting the claims of others (CCS as to the Xerox patent infringement counterclaim) were due December 2, 1996. CCS did not file any expert reports with respect to the Xerox patent infringement counterclaim.

Rather, on May 3, 1999, CCS submitted Dr. Garvin's declaration to refute Dr. Mark's affidavit and expert report. *See* Declaration of Donald Garvin, attached as Exhibit 11 to *Memorandum Of Points And Authorities: (1) In Support Of Cross Motion By Plaintiff CCS For Summary Judgment On Xerox Counterclaim For Patent Infringement; And (2) In Opposition for Xerox' Motion For Summary Judgment On Patent Infringement Claim* (Doc. # 756) filed May 3, 1999.

 A district court may impose sanctions for a party's failure to obey a scheduling order including any of the sanctions provided in Rule 37(b)(2)(B), (C), and (D). *See* Fed.R.Civ.P. 16(f). The Court has considerable discretion when it comes to imposing sanctions under Rule 37(b), Fed.R.Civ.P. *National Hockey League v. Metropolitan Hockey Club. Inc.,* 427 U.S. 639, 642, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976). In determining which sanctions should be imposed, the Court must consider the purposes to be served by the imposition of sanctions. In *White v. General Motors Corp., Inc.,* 908 F.2d 675 (10th Cir.1990), *cert. denied,* 498 U.S. 1069, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991), the Tenth Circuit outlined those purposes as including (1) deterring future litigation abuse, (2) punishing present litigation abuse, (3) compensating victims of litigation abuse, and (4) streamlining court dockets and facilitating case management.[20] Id. at 683. The primary goal of sanctions is to deter misconduct. *See Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 398, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). In considering the imposition of sanctions, the Court must consider on a case-by-case basis whether a party's failure was substantially justified or whether other circumstances make the imposition of sanctions inappropriate. *In re Westinghouse Elec. Corp. Uranium Contracts Litig.,* 563 F.2d 992, 997 (10th Cir.1977)

---

**20.** While *White* involved sanctions under Rule 11, its principles apply equally to sanctions under Rules 26 and 37. *See Law v. National Collegiate Athletic Ass'n,* 167 F.R.D. 464, 478 n. 22 (D.Kan.1996) (citing *Parker v. Housing Auth. of Kansas City, Kan.,* 1990 WL 126816,*1 (D.Kan.1990)).

(citing *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958)).

Rule 26(a)(2)(A), Fed.R.Civ.P., requires that a party disclose the identity of any expert who may testify at trial. This disclosure must be accompanied by a written report prepared and signed by the witness. In addition, the report must contain:

> a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

Fed.R.Civ.P. 26(a)(2)(B). A party who without substantial justification fails to disclose information in compliance with Rule 26(a) "shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." Fed.R.Civ.P. 37(c)(1).

■ "The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.,* 170 F.3d 985, 993 (10th Cir.1999) (citing *Mid-America Tablewares, Inc. v. Mogi Trading Co.,* 100 F.3d 1353, 1363 (7th Cir.1996)). In determining a sanction, the district court should consider the following factors: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness. *See Woodworker's Supply,* 170 F.3d at 993.

■ Although the decision to exclude evidence is a drastic sanction, *e.g., Summers v. Missouri Pac. R.R. Sys.,* 132 F.3d 599, 604 (10th Cir.1997), plaintiff must abide by the same rules as other litigants. Both Rule 26 and the Court's scheduling order required the disclosure of experts and their reports by December 2, 1996. Pursuant to Rules 37(b)(2)(B) and 37(c)(1), the Court finds that the declaration of Dr. Garvin should be excluded. This sanction will deter future litigation abuse, punish present litigation abuse, compensate Xerox as the victim of litigation abuse, and facilitate case management. *See White,* 908 F.2d at 683. The factors under Rule 37(c)(1) also favor exclusion. Xerox clearly is prejudiced by Dr. Garvin's declaration because CCS never revealed his name or opinions before it filed its opposition to the Xerox motion for summary judgment. To cure any prejudice, the Court would need to let Xerox depose Dr. Garvin, supplement its expert reports and/or affidavits, and submit a supplemental brief on its motion for summary judgment and in opposition to the CCS cross motion. The Court estimates that a final order on the pending motions would be delayed at least six months. Although no trial is currently scheduled, the Court notes the case will be remanded to the Northern District of California in the near future. Any further delay in the briefing of dispositive motions would lead to a corresponding delay in the remand and trial in a case which has already been pending for more than five years. The Court finds that an additional six-month delay to accommodate the CCS failure to disclose an expert witness is unacceptable. CCS blatantly ignored its disclosure obligations for more than two and one-half years. Indeed, to date, CCS has not submitted an expert report from Dr. Garvin which complies with Rule 26(a)(2)(B). For these reasons, the Court strikes the declaration of Dr. Garvin.

■ Xerox argues that the Court should also exclude Dr. Garvin's declaration under *Daubert v. Merrell Dow*

*Pharm.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rule 702, Fed. R.Evid., provides that a witness who is qualified by knowledge, skill, experience, training, or education, may testify in the form of opinion as to scientific, technical, or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. Under *Daubert,* when expert testimony is offered, a district court must determine at the outset, pursuant to Rule 104(a), Fed.R.Evid., the expert testimony is reliable and whether it will assist the trier of fact to understand or determine a fact in issue. *See id.* at 592, 113 S.Ct. 2786. The district court may consider several nondispositive factors in determining whether a particular scientific theory or technique is reliable. These factors include (1) whether the proffered technique can and has been tested; (2) whether the technique or theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a technique in the relevant scientific community. *Id.* at 593–94, 113 S.Ct. 2786. The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation." *Mitchell v. Gencorp. Inc.,* 165 F.3d 778, 780 (10th Cir.1999). An expert's qualifications are relevant to the reliability inquiry. *See United States v. Taylor,* 154 F.3d 675, 683 (7th Cir.1998). The Court must also determine the relevance of the testimony by determining whether the reasoning or methodology properly can be applied to the facts in issue. The *Daubert* factors apply to all expert testimony, whether "scientific" or not. *See Kumho Tire Co. Ltd., v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

Dr. Garvin has only one opinion which is relevant to the Court's analysis: that because Dr. Mark tested only a single sample from each vendor, his testing methodology was inconsistent with the sampling methods used by government agencies and the Association of Official Analytical Chemists. The Court notes that CCS has not offered Dr. Garvin's curriculum vitae, a list of publications, or an expert report in compliance with Rule 26. CCS has not shown that Dr. Garvin, who is a chemist, has specialized knowledge or relevant experience in sampling techniques. Dr. Garvin does not claim that his proposed sampling technique (taking five samples instead of one) has been tested or subject to peer review, or that it alone is generally accepted in the relevant scientific community. He does not note the error rate of his technique. Dr. Garvin's conclusion on sampling techniques appears to be based merely upon his subjective belief. *See Mitchell,* 165 F.3d at 780. He has not shown that when copier parts have the same part number and originate from the same vendor, they are likely to have a variable chemical composition. Accordingly, when applied to the copier parts at issue, Dr. Garvin's opinion that five samples should be tested is nothing more than unsubstantiated personal opinion. *See id.* CCS has not shown that Dr. Garvin's opinion is relevant or that it would assist the trier of fact to understand or determine a fact in issue.[21] The Court therefore strikes his declaration.

**21.** CCS attached to its reply brief a letter from Dr. Garvin which attempts to explain some of his qualifications and experience. *See* Exhibit E to *Creative Copier Services: (1) Reply Brief In Support of Its Cross–Motion For Summary Judgment On Xerox Patent Infringement Counterclaim; And (2) Response in Opposition To Xerox' Motion To Strike the Declaration Of Donald Garvin* (Doc. # 778) filed June 11, 1999. Xerox correctly notes that the letter is unsworn and that it therefore does not qualify as an affidavit. *See* D. Kan. Rule 56.1; 28 U.S.C. § 1746; *Schartz v. Unified School Dist. No. 512,* 963 F.Supp. 1067, 1070 (D.Kan.1997). Moreover, the Court cannot consider it unless plaintiff has properly authenticated it. *See IBP, Inc. v. Mercantile Bank,* 6 F.Supp.2d 1258, 1263 (D.Kan.1998). For these reasons, the Court will strike Dr. Garvin's letter. Even if the Court were to consider the letter, it would reach the same result regarding the admissibility of Dr. Garvin's opinions on sampling techniques.

## B. *Analysis*

### 1. *Claim Construction*

In the '239 patent, the Court must first construe the term "about," which modifies a numerical range for the weight of tabular alumina used on the heat roll coating. The construction of a patent is a question of law for the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). In construing patent claims, the Court looks first to intrinsic evidence, *i.e.* the patent claims, the patent specification and, if in evidence, the prosecution history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed.Cir.1995), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996)). The Court must determine how the claim would be interpreted by one of ordinary skill in the art at the time the patent was issued. *See Markman*, 52 F.3d at 986.

The analysis begins with the words of the claims. The language of the claim is to be given its ordinary meaning to a person of ordinary skill in the relevant art, unless it appears from the patent and the file history that the terms were used differently by the inventor. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1387 (Fed.Cir.1992). Thus a patentee is not limited to ordinary dictionary definitions of terms, but is free to be his or her own lexicographer. *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569 (Fed.Cir.1983).

"Claims must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979. The specification includes a written description of the invention and a best mode or preferred embodiment of the invention. *Id.* "The specification must enable a hypothetical person having ordinary skill in the art to make and use the invention, and so is typically drafted in some sense as an interpretive guide in reading the claims." *MediaCom Corp. v. Rates Tech., Inc.*, 4 F.Supp.2d 17, 25 (D.Mass.1998). The limitations in particular embodiments should not be read into the claims, although the Court may use the embodiments as definitional guides for words in the claims. *Ethicon Endo–Surgery, Inc., v. United States Surgical Corp.*, 93 F.3d 1572, 1574–76 (Fed.Cir.1996). The Court should also consider the prosecution history or "file wrapper," if in evidence, to ascertain the meaning of any claim. *Markman*, 52 F.3d at 979. The construction of the patent may be confirmed by the inventor's understanding of the claimed invention. *Id.* "Although the prosecution history can and should be used to understand the language used in the claims, it too cannot enlarge, diminish, or vary the limitations in the claims." *Id.* (further quotations and citations omitted).

Finally, the Court may consider extrinsic evidence, including publications, dictionaries, and expert testimony, if necessary to assist in determining the meaning or scope of terms in the claims. *Vitronics Corp.*, 90 F.3d at 1583. Extrinsic evidence "is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims." *Markman*, 52 F.3d at 981. The claims themselves set the metes and bounds of the inventor's right to exclude others from practicing the invention.

Neither party suggests that the term "about" should be given a special meaning in the context of a coating used on a copier heat roll. Therefore, after reviewing the '239 patent, the patent specification, and the dictionary definitions of the term, the Court finds that the term about should be given its ordinary and customary meaning. Accordingly, the Court construes the term "about" in the '239 patent to mean "reasonably close to." *See* Webster's Third New Int'l Dictionary (1993) at 5 (about means approximately or near); *CellNet Data Sys., Inc. v. Itron, Inc.*, 17 F.Supp.2d 1100, 1114 (N.D.Cal.1998) (construing "about 1.750

inches" to mean reasonably close to 1.750 inches).

## 2. *Infringement*

■ Xerox, as the patent holder, bears the burden of establishing that either literally or under the doctrine of equivalents, the accused device meets every element of its patent claims. *See Brita Wasser–Filter–Systeme GmbH v. Recovery Eng'g, Inc.*, 41 F.Supp.2d 818, 821 (N.D.Ill.1999). "Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device, *i.e.* when the properly construed claim reads on the accused device exactly." *Engel Indus., Inc. v. Lockformer Co.*, 96 F.3d 1398, 1405 (Fed.Cir.1996). Even if an accused device does not literally satisfy all of the limitations of a patent, however, infringement may be found under the doctrine of equivalents. *See Warner–Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29–30, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997), *rev'g*, 62 F.3d 1512, 1517 (Fed.Cir.1995). The doctrine of equivalents rests on the rationale that limiting enforcement of patent rights to literal infringement may be harsh in some circumstances and "would place the inventor at the mercy of verbalism." *Warner–Jenkinson*, 62 F.3d at 1517 (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097 (1950)).

CCS first argues that Xerox has not produced evidence that it made, used or sold parts equivalent to the ones which Xerox experts tested. *See* 35 U.S.C. § 271(a) (infringement includes making, using or selling patented invention). Xerox relies on circumstantial evidence to establish this point. Either directly or through intermediaries, it purchased copier parts from third party vendors. It asks the Court to infer that other parts with the same parts numbers, from the same vendors, are equivalent to those tested. In the circumstances of this case, the Court finds that such an inference is reasonable and that a jury would necessarily draw such an inference as to DX 12 and DX 38, but not as to DX 28, DX 32 and the nondag coated dicorotron. The gap between the time when Xerox purchased its parts and the time when CCS purchased parts bearing the same part numbers is ten months for DX 12 and approximately seven months for DX 38. Based on the evidence which Xerox has presented, along with the lack of evidence by CCS, no reasonable jury could conclude that the parts which CCS ordered from the same vendors, bearing the same part numbers, were not equivalent to DX 12 and DX 38.

CCS claims that a reasonable jury could not find infringement because Xerox has not shown that third party manufacturers consistently used the same formula for parts. CCS has not presented any evidence, however, that parts manufacturers change their copier part formulas over time, particularly over short periods of time such as seven and ten months.[22] Common sense suggests that when manufacturers market a particular part for a particular purpose under a particular part number, it would be self defeating to frequently alter the chemical composition of the product in a way that would materially affect its function, the way in which it achieved that function, or its performance. Moreover, the record suggests no reason why manufacturers would tinker with the chemical composition of any of the products at issue in this case. Any conclusion that they actually did so, with regard to these products, would be sheer speculation. Dr. Mark testified:

> Q: You have no basis for saying that the heat fuser roller that D & R Products sold the next day conformed to the

---

**22.** In his declaration, Dixon states that third party vendors use the same part numbers even though they change various characteristics of the parts over time. *See* Dixon Declaration ¶ 13, attached as Exh. 6. The declaration, however, does not affirmatively demonstrate that Dixon has personal knowledge or is competent to testify regarding the practices of third party vendors. *See* Fed. R.Civ.P. 56(e). Accordingly, the Court will exclude this portion of paragraph 13 of the Dixon declaration.

particular heat fuser roller that you tested; correct?

A: I would be astonished if they could be different and sold as the same part. * * *

Q: And as a scientist, you have no basis for knowing whether any other heat fuser roll at D & R sold on that same day, whether under the same part number or another part number, chemically corresponded to the one that you tested; do you?

A: If it had the same part number, I would be more than 99 percent certain.

Q: What's the basis for that, Dr. Mark?

A: Just going through life and buying things that are reproducible. People sell things and represent that they are the same as the thing you bought before with the same part number. * * *

Q: And, as a result, you cannot testify under oath that a D & R heat roller that you got on one day or that was sold on one day, was chemically different or the same as a D & R heat roller that you tested; can you?

A: I cannot testify 100 percent. But I would be overwhelmingly confident that they would be [the same].[23]

Mark Depo. at 57, 62, 72–73. In its discovery responses, even CCS did not speculate that over time, manufacturers changed the chemical formulation of their copier parts.[24]

CCS next claims that Xerox has not shown that DX 12 and DX 38 infringe the '239 patent. Xerox claims that the accused parts infringe under the doctrine

of equivalents. The traditional measure of equivalency is the "function-way-result" test. *See Warner–Jenkinson*, 62 F.3d at 1518–21. It focuses on whether an element of an accused device performs substantially the same function in substantially the same way to achieve substantially the same result as each element of the claimed device. *See id.* at 1518. The Federal Circuit has noted other relevant inquiries. For example, the substantiality of differences may be measured by "whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was." *Id.* at 1518; *see Warner–Jenkinson*, 520 U.S. at 36, 117 S.Ct. 1040; *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1261 (Fed.Cir. 1989). "Known interchangeability" of an element in the accused device with a claimed element is "potent evidence that one of ordinary skill in the relevant art would have considered the change insubstantial." *Warner–Jenkinson*, 62 F.3d at 1519. Known interchangeability is evaluated at the time of infringement, not at the time the patent was issued. *See Warner–Jenkinson*, 520 U.S. at 37, 117 S.Ct. 1040.

The only evidence regarding the significance of the differences between DX 12 and DX 38 and the '239 patent is contained in the affidavit and testimony of Dr. Mark. Dr. Mark states that the differences between the weight of alumina in DX 12 and DX 38 (297 and 101 respectively) are insubstantial compared to the range claimed in the '239 patent (about 128 to 250). *See*

---

**23.** The Court cites Dr. Mark's testimony only to illustrate that common sense supports the conclusion that manufacturers generally do not alter the composition of a mass produced operable replacement part without changing the part number. The Court does not suggest that Dr. Mark is an expert in this particular area.

**24.** For example, CCS admitted that the 1090 fuser heat rolls from D & R Products were not substantially different from the 1090 fuser heat rolls from Xerox. *See* CCS Answers to Xerox First Requests For Admissions No. 67, attached as Exh. C to *Xerox's Memorandum*

*(1) In Reply To CCS's Opposition To Xerox's Summary Judgment Motion On Patent Infringement; And (2) In Opposition To CCS's Cross–Motion For Summary Judgment* (Doc. # 768) filed June 1, 1999. In this response and others, CCS did not claim that parts shipped by the same vendor varied over time or that it could not answer requests for admissions because of potential variations over time. *See, e.g., id.*, Nos. 63–64, 66–67, 69–70. Absent contrary evidence, a reasonable jury would conclude from the admissions and other evidence of record that Graphic Associates and OEM Supplyco sold similar heat rolls over the pertinent time period.

*Affidavit of James E. Mark, Ph. D.* ¶¶ 9, 12; Mark Depo. at 78 (ranges are broad, slight deviation from range should not matter); *id.* at 107–08 (differences inconsequential, unimportant).

CCS argues that Dr. Mark's opinions are inadmissible because he employed improper sampling techniques. It also claims that Dr. Mark is not qualified to opine whether the differences between the accused devices and the '239 patent are substantial.[25] The Court has already set forth the standards for admissibility of expert testimony under *Daubert*. The Court addresses first whether Dr. Mark is qualified to testify regarding the significance of the differences between DX 12 and DX 38 and the '239 patent, for purposes of the *doctrine of equivalents*. Dr. Mark is an expert in polymer rubber chemistry. *See Affidavit of James E. Mark, Ph. D.* ¶ 1. CCS apparently concedes that he is qualified to test the accused heat rolls for the relative weights of siloxane, tabular alumina and iron oxide. Dr. Mark's experience in polymer chemistry does not qualify him as an expert, however, in the field of copier fuser heat rolls. Dr. Mark does not mention whether DX 12 or DX 38 perform substantially the same function in substantially the same way to achieve substantially the same result as the range specified in the '239 patent. He merely concludes that the differences are insubstantial based on his review of the patent, the prosecution history, and his discussions with one of the inventors. CCS correctly points out that Xerox has not offered any objective technological evidence that one of ordinary skill in the relevant art would have considered the differences insubstantial. *See Warner–Jenkinson*, 520 U.S. at 36, 117 S.Ct. 1040. Based on the present record, Xerox has not shown that Dr. Mark is qualified to testify on this point. *See id.* Accordingly, the Court must exclude that part of Dr. Mark's affidavit at this time. Absent the expert affidavit or testimony of Dr. Mark, Xerox has not shown as a matter of law that the differences between DX 12 and DX 38 and the '239 patent are insubstantial for purposes of the doctrine of equivalents.

Conversely, CCS has not produced evidence that the differences between the accused devices and the '239 patent are substantial. The significance of the differences can be measured in several ways. First, the Court notes that the absolute value of the range is 122 (250 minus 128). The 297 relative weight of tabular alumina in DX 12 varies from the claimed range by 38.5 per cent of the absolute value of the range, *i.e.* 47 divided by 122. The 101 relative weight of tabular alumina in DX 38 varies from the claimed range by 22.1 per cent of the absolute value of the range, *i.e.* 27 divided by 122. *See id.* at 107–08 (Mark employed similar method to analyze significance of differences). By definition, what variance will be considered "reasonably close" to a claimed range will vary, depending on the underlying technology. Nevertheless, several courts have affirmed findings that accused devices with variances of 50 per cent of the absolute value of a claimed range modified by the term "about" infringe the patent claim. *See Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1219–20 (Fed.Cir.1995) (about 5:1 to 7:1 ratio may encompass 4:1 ratio under the doctrine of equivalents; variance of 50% of absolute value), *cert. denied*, 520 U.S. 1115, 117 S.Ct. 1243, 137 L.Ed.2d 326 (1997); *Kolene Corp. v. Motor City Metal Treating, Inc.*, 440 F.2d 77, 82 (6th Cir.1971) (about 25–40% includes 50%;

---

**25.** CCS has attacked Dr. Mark's qualifications only indirectly. *See* CCS Memorandum (Doc. # 756) filed May 3, 1999 at 8 (Dr. Mark not competent to establish equivalence under governing legal standard). The Court nevertheless finds that his qualifications are relevant to the reliability of his testimony and it has a duty to conduct a preliminary assessment of the reliability of the expert testimony even absent an objection. *See Questar Pipeline Co. v. Grynberg*, 201 F.3d 1277, 1289 (10th Cir. 2000) (quoting *Hoult v. Hoult*, 57 F.3d 1, 4 (1st Cir.1995)); *see also Taylor*, 154 F.3d at 683 (qualifications relevant to reliability inquiry).

variance of 67% of absolute value); *see also Modine Mfg. Co. v. United States Int'l Trade Comm'n,* 75 F.3d 1545, 1554 (Fed.Cir.1996) ("Although it is rarely feasible to attach a precise limit to 'about,' the usage can usually be understood in light of the technology embodied in the invention."). For these reasons, the CCS cross motion on the doctrine of equivalents issue is overruled.

The record does not reveal the length of time between the date(s) when Xerox purchased DX 28 (via Beck), DX 32 and the non-dag coated dicorotron and the date(s) when CCS purchased other parts with the same part numbers. Neither party has produced evidence regarding when Xerox obtained these parts, or the practices of third party vendors regarding these parts. Absent such evidence and in light of the testing data which Xerox has presented regarding parts acquired from third party vendors, a reasonable jury could find in favor of either party on the infringement issue.

For the above reasons, the Court finds that disputed issues of material fact preclude a summary determination that CCS did or did not use parts which infringed the '239 patent, the '258 patent and the '322 patent. Accordingly, both motions for summary judgment on the issue are overruled.

### 3. *CCS Notice Defense*

 CCS argues that prior to June 1996, when Xerox served its expert reports, Xerox did not provide meaningful notice of the devices that infringed the Xerox patents. CCS asks the Court to grant summary judgment in its favor because Xerox has not offered evidence that CCS infringed Xerox patents after June 1996. The patent statute provides that a patent holder may not recover damages for infringement unless the patented articles or the packaging of the articles are marked with the patent number or the alleged infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. 35 U.S.C. § 287(a). The filing of an action for infringement constitutes actual notice. *Id.*

Here, Xerox did not mark parts or packaging with pertinent patent numbers and its price books did not identify which parts were patented. Xerox filed its infringement counterclaim on April 16, 1995. The parties dispute whether the counterclaim provided "actual notice" to CCS. "Although there are numerous possible variations in form and content, the purpose of the actual notice requirement is met when the recipient is notified, with sufficient specificity, that the patent holder believes that the recipient of the notice may be an infringer." *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.,* 127 F.3d 1462, 1470 (Fed.Cir.1997). Whether the notice requirement of Section 287 has been satisfied generally is a question of fact. *See Maxwell v. J. Baker, Inc.,* 86 F.3d 1098, 1111 (Fed.Cir.1996), *cert. denied,* 520 U.S. 1115, 117 S.Ct. 1244, 137 L.Ed.2d 327 (1997); *AccuScan, Inc. v. Xerox Corp.,* No. 96 Civ. 2579, 1998 WL 603217, at *11 (S.D.N.Y. Sept. 11, 1998); *Wokas v. Dresser Indus., Inc.,* 978 F.Supp. 839, 845 (N.D.Ind.1997).

Xerox contends that it provided CCS actual notice when it filed its counterclaims, which identified 102 patents which CCS had allegedly infringed.[26] CCS claims that the counterclaim did not constitute actual notice because it did not identify by parts number the specific products which allegedly infringed.

CCS is not entitled to judgment as a matter of law on this issue. Despite the alleged defects in the Xerox counterclaim, CCS denied that it had infringed the pat-

---

**26.** CCS asserts that Xerox cannot show infringement based on the OEM Supplyco heat rolls because CCS did not purchase any heat rolls from it after February 1995. Except for invoices before March 1995, CCS has not submitted any evidence to support its assertion. Thus the Court cannot rule in favor of CCS as a matter of law on this issue.

ents or otherwise used the patented inventions in violation of the patent laws and further alleged that Xerox had misused the patents. *See Reply of Plaintiff/Counterclaim Defendant Creative Copier Services To Defendant's Counterclaims* (Doc. # 93) filed June 19, 1995 ¶¶ 2, 4, 43; Affirmative Defenses 6–10. CCS also failed to admit or deny the Xerox allegation that its counterclaim constituted notice of infringement under 35 U.S.C. § 287(a). *See id.* ¶ 44. Xerox subsequently amended its counterclaims. *See Defendant And Counterclaim Plaintiff Xerox Corporation's Answer And Counterclaims To The First Amended Complaint Of Creative Copier Services* (Doc. # 258) filed March 26, 1996. CCS again denied that it had infringed any Xerox patents and further asserted that the patents were unenforceable because of Xerox misconduct. *See Plaintiff/Counterclaim Defendant Creative Copier Services' Answer To Xerox Corporation's Third Amended Counterclaim* (Doc. # 276) filed April 15, 1996 ¶¶ 1, 21; Affirmative Defense 7. If CCS did not truly know which parts were covered by the patents identified, it could have filed a motion for a more definite statement under Rule 12(e) of the Federal Rules of Civil Procedure. Moreover, by denying patent infringement and asserting misuse, CCS certified that it had evidentiary support for such allegations. *See* Fed.R.Civ.P. 11(b)(3), (4). Based on this evidence, a reasonable jury could find that CCS understood what parts were covered by the patents asserted by Xerox and that the Xerox counterclaims constituted adequate notice under the patent statute. Accordingly, the Court overrules the CCS motion for summary judgment based on its "notice" defense.

### 4. *CCS Misuse Defense*

 CCS claims that Xerox misused its patent when it prosecuted its patent infringement counterclaim. To prevail on its defense of patent misuse, CCS must show that Xerox has used its patent(s) to secure an exclusive right or limited monopoly beyond the scope of the patent(s) in contravention of public policy. *See Mor-*

*ton Salt Co. v. G.S. Suppiger Co.,* 314 U.S. 488, 492, 62 S.Ct. 402, 86 L.Ed. 363 (1942); *ISO Antitrust Litig.,* 964 F.Supp. at 1458. The patent statute precludes a finding of misuse when the patent holder in good faith seeks "to enforce his patent rights against infringement." 35 U.S.C. § 271(d)(3); *see Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.,* 45 F.3d 1550, 1558–59 (Fed.Cir.1995). The filing of an infringement claim therefore does not constitute misuse unless the claim is (1) objectively meritless and (2) brought in an attempt to interfere directly with the business of a competitor. *See Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 60–61, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) ("*PRE*"); *ISO Antitrust Litig.,* 964 F.Supp. at 1485. A claim is "objectively meritless" if "no reasonable litigant could realistically expect success on the merits." *PRE,* 508 U.S. at 60, 113 S.Ct. 1920.

 CCS contends that the following facts establish misuse:

> In its original and amended counterclaims, Xerox asserted that CCS had infringed 102 patents.

> In February 1996, Xerox tested approximately 20 accused parts protected by eight patents. Xerox nevertheless continued to assert that CCS had infringed 102 patents. *See Defendant And Counterclaim Plaintiff Xerox Corporation's Answer And Counterclaims To The First Amended Complaint Of Creative Copier Services* (Doc. # 258) filed March 26, 1996.

Ronald Zibelli, General Patent Counsel for Xerox, submitted a declaration in support of Xerox's motion for summary judgment in the *CSU, L.L.C. v. Xerox Corp.* case, No. 94–2102, which identified only 22 patents that applied to the 1065, 1075 and 1090 copiers.

> Xerox did not test any parts which CCS actually used in its business.

> Xerox has not notified or filed any action against third party vendors who allegedly sold the infringing parts to CCS and other ISOs.

Some of the above facts tend to establish the second element of misuse, *i.e.* that Xerox intended to interfere with the business of CCS. None of the above facts establish, however, that its infringement claim, based on 102 patents, was "objectively meritless." *PRE,* 508 U.S. at 60–61, 113 S.Ct. 1920. At most CCS has shown that Xerox made strategic decisions to prosecute only certain patents against certain alleged infringers. Nothing in the Patent Act requires Xerox to bear the expense of prosecuting every potential incident of infringement. Moreover, the non-prosecution of certain claims does not mandate a finding that such claims were "objectively meritless."

In this regard, CCS reliance on the Zibelli declaration is misplaced. Zibelli did not purport to identify every patent which applies to the Xerox 10 Series copiers. Rather, he merely gave a list of the patented parts that are used in the 10 Series copiers. Contrary to CCS argument, he did not admit that only 22 patents applied to the 1065, 1075 and 1090 copiers. CCS has not presented any evidence to establish that "no reasonable litigant could realistically expect success on the merits" of the original Xerox patent counterclaim. *See PRE,* 508 U.S. at 60, 113 S.Ct. 1920. Based on the record evidence, no reasonable jury could find that Xerox misused its patents when it filed its patent infringement counterclaim.

For the above reasons, the Court overrules the Xerox and CCS motions for summary judgment on the issues of infringement of the '239 patent, the '258 patent and the '322 patent; the Court overrules the CCS motion for summary judgment based on its "notice defense;" and the Court sustains the Xerox motion for summary judgment with respect to the CCS patent misuse defense.

## IV. Xerox's Copyright Infringement Counterclaim

### A. *Factual Background*

For purposes of the Xerox motion for summary judgment on its copyright infringement counterclaim, the following facts are undisputed, deemed admitted or, where disputed, viewed in the light most favorable to CCS:

> Xerox alleges that CCS infringed its copyrights in service manuals. *See Defendant And Counterclaim Plaintiff Xerox Corporation's Answer And Counterclaims To The First Amended Complaint Of Creative Copier Services* (Doc. # 258) filed March 26, 1996, at ¶¶ 22–29. Xerox owns copyrights, which it has duly registered pursuant to the Copyright Act, in the service manuals for its models 1050, 5052, 1065, 1075 and 1090 copiers. Xerox did not authorize CCS to reproduce these manuals.

In late 1988 or early 1989, Xerox stopped selling service manuals directly to ISOs such as CCS. For model 1075 and 1090 copiers, CCS made copies of Xerox service manuals which it obtained from a Xerox training school. *See* Dixon Depo. at 231–33. CCS last copied a Xerox manual in approximately March 1995. *See id.* Dixon later testified that CCS made four or five copies of manuals for the model 1090 copier. *See* Dixon Depo. at 402–03. Dixon did not specify whether the manuals which it copied were obtained from a Xerox training school, borrowed from CCS customers who had purchased them from Xerox, or purchased from Graphic Associates, a third party vendor, by CCS. *See id.* at 400–01. Dixon also did not know whether the manuals which CCS purchased from Graphic Associates contained the same material as Xerox manuals.[27] See id.

---

**27.** Dixon attached to his declaration an example of a purchase order for manuals from Graphic Associates. *See* Exh. F to Declaration of William Dixon, attached as Exh. 9 to Consolidated Appendix—Volume I (Doc. # 775) filed June 2, 1999. The attached purchase orders are for "Master Locator" manuals. Xerox attempts to establish that these manuals (and thus any manuals which CCS obtained from Graphic Associates) were copyrighted manuals for the Xerox model 1075 copier. Xerox submitted the Declaration of

In response to an interrogatory from Xerox regarding CCS purchase and use of Xerox manuals, CCS answered:

CCS purchased original manuals from Xerox, either when CCS purchased Xerox copiers or through the authorized use of a customer end user number. Xerox manuals were also given to CCS employees who attended Xerox training center school. Some of the original manuals may have been brought to CCS by former Xerox employees. CCS has not maintained records of which manuals may have been supplied by former Xerox employees. Some of the original manuals were photocopied when they became too deteriorated to use. Other generations were made from the photocopies when the photocopies became too deteriorated to use. CCS has not maintained records of the number of times that Xerox manuals were photocopied. However, it is estimated that approximately 10 photocopies of Xerox manuals have been made at CCS since 1988.

John J. Papietro, attached as Exhibit 1 to *Xerox Corporation's Reply Memorandum In Support Of Motion For Summary Judgment On Its Copyright Infringement Counterclaims* (Doc. # 780) filed June 15, 1999, to establish this point. Papietro claims that the Master Locator manual which is attached to Dixon's declaration contains the same part number as a Parts List for which Xerox has a registered copyright.

Papietro's conclusion is erroneous, however, because Dixon did not attach a Master Locator manual to his declaration. Dixon attached only two sample invoices from Graphic Associates for such a manual. *See* Exh. 26 to Consolidated Appendix—Volume III (Doc. # 777) filed June 2, 1999. No part number or copier model number is identified in either invoice. CCS requests that the Court strike Papietro's declaration because it raises a new argument, *i.e.* that CCS illegally copied the Xerox model 1075 Master Locator manual. Given that Papietro's declaration fails to establish this point, the Court overrules the CCS request as moot. Dixon did refer to a model 1075 Master Locator, in another section of his declaration, and that manual was attached as a separate exhibit to plaintiff's opposition brief. The model 1075 Master Locator which is attached as Exhibit 26, however, is a printout of Dixon's original microfiche,

CCS' Answers to Xerox's First Set Of Interrogatories at 8, attached as Exhibit 6 to *Xerox Corporation's Memorandum In Support Of Motion For Summary Judgment On Its Copyright Infringement Counterclaims* (Doc. # 745) filed April 19, 1999. CCS did not mention Graphic Associates in its response to this interrogatory.[28] See id. In response to a request for admission, CCS admitted "that its employees copied in the aggregate a few Xerox manuals." CCS' Answers To Xerox's First Set Of Requests For Admissions at 11, Exhibit 24 to *Consolidated Appendix To Plaintiff Creative Copier Service's Responses In Opposition To Xerox' Motion For Summary Judgment On Antitrust, Copyright, And State Law Claims*, Volume III (Doc. # 777) filed June 2, 1999. CCS did not mention Graphic Associates in this response. *See id.*

James Blake, a former CCS employee, told Dixon that he would not copy anything that had a copyright on it. *See* Blake Depo. at 72. He *may* have told

which he had purchased from Xerox before 1989. *See* Dixon Declaration ¶ 19.

28. In the interrogatory, Xerox asked CCS to identify each manual that it had used or reproduced and where it obtained each manual. In response, CCS invoked Rule 33(d), Fed. R.Civ.P., and referred to documents it had produced to Xerox. Xerox argues that CCS identified a legitimate source only for the model 1050 manual and thus the CCS manuals for the model 5052, 1065, 1075 and 1090 copiers infringe Xerox's copyrights. Dixon did attach to his declaration invoices for model 1050 manuals that a CCS customer had ordered from Xerox. *See* Exh. F to Dixon Declaration, attached as Exh. 9 to Consolidated Appendix—Volume I (Doc. # 775) filed June 2, 1999. Dixon stated in his declaration, however, that these invoices were only an example of purchases from Xerox through a CCS customer. He did not state that these were the only manuals which CCS had obtained from Xerox. Moreover, Xerox has not included in the record the documents which CCS produced in response to the Xerox interrogatory. Thus this particular part of the CCS interrogatory response, and the Dixon declaration, do not constitute an admission that CCS copied model 5052, 1065, 1075 and 1090 manuals.

Dixon that he was concerned about a copyright situation. *See id.* at 74. According to Blake, CCS technicians made copies because they did not want their original manuals to get dirty or be damaged while they were working on copiers. *See id.* Before CCS, Blake worked for Kinko's and had become familiar with the general prohibition against copying copyrighted materials. *See id.* at 72. Blake left CCS in 1991.

### B. *Analysis*

#### 1. *Infringement*

■ To establish copyright infringement, Xerox must show ownership of a valid copyright and copying of protected elements of the copyrighted material. *See Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 831 (10th Cir.1993); *ISO Antitrust Litig.*, 964 F.Supp. at 1472. The Copyright Act provides that a certificate of registration of a copyright "shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 401(c). Xerox has attached certificates of copyright registration in its manuals for its model 1050, 1065, 1075 and 1090 copiers. Thus Xerox has established that it owns valid copyrights in these manuals. CCS does not dispute this conclusion.

Xerox also has established that CCS copied Xerox manuals for the model 1075 and 1090 copiers. As explained above, CCS admits that it made copies of these manuals which it obtained from a Xerox training school. Moreover, CCS admits in its discovery responses that it copied a few Xerox manuals. By copying the entire manuals, CCS necessarily copied materials protected under the Copyright Act. *See ISO Antitrust Litig.*, 964 F.Supp. at 1476; *Triad Sys. Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1335 (9th Cir.1995), *cert. denied*, 516 U.S. 1145, 116 S.Ct. 1015, 134 L.Ed.2d 96 (1996).

CCS claims that the proof is insufficient because Dixon did not specify in his deposition that the manuals which it copied were from Xerox. CCS attempts to intertwine two passages of Dixon's testimony. In the first passage, Dixon admitted that CCS copied model 1075 and 1090 manuals which it obtained from Xerox:

Q: Where do you obtain service manuals?

A: We receive service manuals from schools that we attended with Xerox. We have attended 1075, 1090 school and *we got manuals from there.*

*We made copies of those manuals,* we bought manuals from other ISOs.

Q: When was the last time Creative made a copy of a Xerox manual?

A: I don't know. A year ago or so.

\*　　\*　　\*　　\*　　\*　　\*

Q: Do you remember what models were the manuals for that Creative has made copies for?

A: I couldn't tell you exactly. We bought some manuals from some people; *we made copies of some.* We got some manuals from customers.

Q: *Have you seen, at Creative, a photocopied 1090 service manual?*

A: *Yes.*

Q: *Have you seen photocopie[s] of 1075 service manuals?*

A: *Yes.*

\*　　\*　　\*　　\*　　\*　　\*

Q: Has Creative photocopied manuals for the 1065?

A: I don't know. I couldn't tell you.

Q: How about for the 1050?

A: I couldn't tell you.

Q: What about for the 9000 family?

A: I couldn't tell you that either.

Dixon Depo. at 231–33 (emphasis added). In a subsequent deposition, Dixon testified that CCS had made four or five copies of manuals for the model 1090 copier. *See* Dixon Depo. at 402–03. Dixon did not specify whether CCS made the copies from manuals which it obtained from Xerox training school, manuals ordered from Xerox by CCS customers, or manuals CCS purchased from Graphic Associates. *See*

*id.* at 400–01. Dixon did not know if the manuals from Graphic Associates contained the same material as Xerox manuals.

Dixon's declaration, however, recites his belief that "any copying that was done involved service documentation we received from third party sources, not Xerox." Dixon Declaration ¶ 74. Dixon also states that when counsel asked when CCS had last copied a Xerox manual, he understood the deposition inquiry to refer to manuals for Xerox machines, not manuals obtained from Xerox. *See id.* ¶ 76; Dixon Depo. at 231. Dixon does not explain his answer to the preceding question, however, in which he admits that CCS received service manuals for the model 1075 and 1090 copiers from Xerox training school and that it copied those manuals. Dixon also fails to explain CCS discovery responses in which CCS admits that its employees copied Xerox manuals. CCS does not mention Graphic Associates or any other third party vendor in its responses. Although the Court views the record in the light most favorable to CCS, the only reasonable conclusion from CCS discovery responses is that CCS copied manuals which it obtained from Xerox.[29]

As discussed earlier, the Court will disregard declarations which are inconsistent with prior sworn testimony or interrogatory responses if the changes constitute an attempt to create a sham issue of fact. *See Franks,* 796 F.2d at 1237. To determine whether a declaration is a sham, the Court considers "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to ex-

plain." *Franks,* 796 F.2d at 1237. The Court notes that the Dixon declaration is 24 pages and attempts to address nearly every issue raised in the summary judgment briefing. In addition, the factors discussed in *Franks* favor striking the portion of the declaration relating to the source of the manuals CCS copied. First, CCS drafted the interrogatory answer and thus cannot complain that it was somehow tricked by the question. The opportunity to consult with counsel before submitting the answer clearly provides a greater opportunity for accuracy than the mere availability of cross examination. With respect to the prior Dixon deposition testimony, CCS counsel had the opportunity to cross examine Dixon to clarify any ambiguity. Second, CCS and Dixon had access to the pertinent evidence at the time of the prior answers. Third, CCS does not claim that its interrogatory response was ambiguous. In its interrogatory response, CCS stated that it had copied manuals obtained from Xerox. In his first deposition, Dixon did not identify any source of manuals, other than Xerox. In light of this clear evidence, the Court strikes paragraph 74 of the Dixon declaration as an attempt to create a sham issue of fact.

For the above reasons, the Court concludes that the record evidence establishes as a matter of undisputed fact that CCS copied Xerox's copyrighted manuals for the model 1075 and 1090 copiers. No reasonable jury could find otherwise.

2. *Statute of Limitations Defense By CCS*

■■■ CCS contends that the copyright infringement claims are barred by the statute of limitations. Xerox seeks summary judgment on this defense. CCS bears the burden of proof on its affirma-

---

**29.** The source of copyrighted manuals generally is not critical, provided that the claimant establishes that defendant made, used or sold copyrighted materials. For purposes of the Xerox motion, however, the source of the manuals is important because Dixon testified that the manuals which CCS obtained from

Graphic Associates had a different format than Xerox manuals and that he was unsure whether the manuals from Graphic Associates were written by Xerox. *See* Dixon Depo. at 401. Xerox has not offered any evidence to show whether the manuals from Graphic Associates infringe Xerox copyrights.

tive defense. *See Koch v. Shell Oil Co.*, 52 F.3d 878, 880 (10th Cir.1995). The Copyright Act provides that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). Courts apply federal common law principles to determine whether a claim has "accrued" for purposes of a federal claim. *See Industrial Constructors Corp. v. Bureau of Reclamation*, 15 F.3d 963, 968–69 (10th Cir.1994); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir.1990), *cert. denied*, 501 U.S. 1261, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991). A claim accrues under the Copyright Act when the copyright holder knows or reasonably should have known of the infringement. *See Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir.1994); *Fisher v. United Feature Syndicate, Inc.*, 37 F.Supp.2d 1213, 1216 (D.Colo.1999). This principle, which is applied to many types of claims, is referred to as the discovery rule.

CCS apparently claims that Xerox should have known, when it stopped selling service documentation to CCS in 1989, that CCS would have to copy service manuals to stay in business. CCS reasons that the Xerox claims therefore accrued in 1989, because Xerox either knew or should have known of the infringement at that time.

The CCS argument fails for two reasons. First, CCS claims that it did not photocopy Xerox manuals (or that it only copied a few) and yet it stayed in business. Thus Xerox did not have to assume that ISOs such as CCS were copying the manuals if they stayed in business. CCS has not shown that Xerox should have reasonably concluded that ISOs were infringing Xerox copyrights. Second, Xerox is not reasonably charged with knowledge of copying simply because it has refused to sell a protected product. In fact, discovery of CCS copying would have been extremely difficult because CCS had the infringing manuals within its control. Copyright holders should not be forced to conduct investigations every time they exercise their right to refuse to license a copyrighted product. The discovery rule does not place such an onerous burden on copyright holders. *Cf. Schock v. United States*, 21 F.Supp.2d 115, 119 (D.R.I.1998) (duty to investigate not triggered until claimant receives warning of potential problem).

CCS next argues that the Xerox claims accrued in May 1993, when Xerox served a subpoena on CCS and entered its premises. Even if this visit put Xerox on notice of infringement, Xerox filed its copyright infringement counterclaim on April 12, 1995. This date is well within the three year statute of limitations, and CCS' argument is unavailing.

In sum, CCS has not demonstrated an issue of triable fact on its statute of limitations defense. The Court sustains Xerox's motion for summary judgment on this issue.

3. *CCS Fair Use Defense*

■ CCS argues that making a single copy of a protected manual for personal use is permitted, *i.e.* making such a copy is a "fair use." Plaintiff relies on *Williams & Wilkins Co. v. United States*, 203 Ct.Cl. 74, 487 F.2d 1345, 1350 (1973), *aff'd*, 420 U.S. 376, 95 S.Ct. 1344, 43 L.Ed.2d 264 (1975). In *Williams*, the court held that government research libraries could make a single photocopy of an entire medical journal article without violating the Copyright Act. *Id.* at 1362. The court emphasized, however, the limited nature of its holding:

> [o]ur holding is restricted to the type and context of use by NIH [National Institute of Health] and NLM [National Library of Medicine], as shown by the record. That is all we have before us, and we do not pass on dissimilar systems or uses of copyrighted materials by other institutions or enterprises, or in other fields, or as applied to items other than journal articles, or with other significant variables.

*Id.* The court's holding relied in part on its finding that "medical science would be ser-

iously hurt if such library photocopying were stopped." *Id.* at 1356.

Obviously, the copying of Xerox service manuals is distinguishable from the conduct described in *Williams.* CCS is not a government research library and it does not purport to promote medical research. CCS is a commercial entity. The Supreme Court has noted that every commercial use of a copyrighted material is presumed to be an unfair exploitation of the monopoly privilege that belongs to the copyright holder. *See Sony Corp. v. Universal City Studios, Inc.,* 464 U.S. 417, 451, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). CCS has not presented authority or facts which are sufficient to overcome this presumption.

CCS also relies on *Williams* for the proposition that a single copy of a manual may not constitute a violation of the Copyright Act. As explained above, the exception in *Williams* for government research libraries does not apply to CCS. The Copyright Act grants a copyright holder the exclusive right "to reproduce the copyrighted work in *copies.*" 17 U.S.C. § 106(1) (emphasis added). Although the statute refers to copies, "the making of even a single unauthorized copy is prohibited." *Sony,* 464 U.S. 417, 463, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (Blackmun, J., dissenting); *Atari Games Corp. v. Nintendo of Am., Inc.,* 975 F.2d 832, 840 (Fed.Cir. 1992). CCS has not cited any relevant authority for its contention that it is permitted to make a single copy of a copyrighted manual or, indeed, that its copying was limited to a single copy.

For these reasons, the Court sustains Xerox's motion for summary judgment on the CCS fair use defense.

### 4. *CCS Misuse Defense*

CCS claims that any copying was justified because Xerox refused to sell its manuals to ISOs. In a related action, Judge O'Connor held that the Xerox unilateral refusal to sell its copyrighted products did not constitute an antitrust violation or copyright misuse. *See ISO Antitrust Litig.,* 989 F.Supp. at 1143. To es-

tablish copyright misuse, CCS must show either (1) that Xerox violated the antitrust laws, or (2) that Xerox illegally extended its monopoly beyond the scope of the copyright or violated the public policies underlying the copyright laws. *See Lasercomb Am., Inc. v. Reynolds,* 911 F.2d 970, 978 (4th Cir.1990); *Broadcast Music, Inc. v. Hampton Beach Casino Ballroom Inc.,* No. 94–248–B, 1995 WL 803576, at *5 (D.N.H.1995).

The Court adopts by reference its discussion above regarding a patent holder's unilateral right to refuse to sell its patented invention. A similar analysis applies to copyrights. Copyrights protect an author's original expression and do not protect the ideas embodied in that expression. *See Gates Rubber Co. v. Bando Chem. Indus., Ltd.,* 9 F.3d 823, 836 (10th Cir. 1993); 17 U.S.C. § 102(a), (b). A copyright gives its holder the right to refuse to license its original expression to others. *See Stewart v. Abend,* 495 U.S. 207, 228–29, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990); *Orson, Inc. v. Miramax Film Corp.,* 189 F.3d 377, 385 (3d Cir.1999); *see also* 17 U.S.C. §§ 106, 501 (holder has exclusive right to reproduce and distribute its works). A copyright holder "may refrain from vending or licensing [its product] and content [itself] with simply exercising the right to exclude others from using [its] property." *Data General,* 36 F.3d at 1186 (quoting *Fox Film Corp. v. Doyal,* 286 U.S. 123, 127, 52 S.Ct. 546, 76 L.Ed. 1010 (1932)); *see Triad Sys. Corp. v. Southeastern Exp. Co.,* 64 F.3d 1330, 1337 (9th Cir.1995) (manufacturer's refusal to license software to ISOs is not copyright misuse), *cert. denied,* 516 U.S. 1145, 116 S.Ct. 1015, 134 L.Ed.2d 96 (1996); *Service & Training, Inc. v. Data General Corp.,* 963 F.2d 680, 690 (4th Cir.1992) (same); *ISO Antitrust Litig.,* 989 F.Supp. at 1143 (same). The Copyright Act does not limit a copyright holder's right to exclude to a single relevant antitrust market. *See Triad,* 64 F.3d at 1337; *ISO Antitrust Litig.,* 989 F.Supp. at 1143. Accordingly, Xerox has the right to unilaterally refuse to sell or

license its copyrighted expressions to competitors, including CCS.

In *Triad*, the Ninth Circuit rejected the contention of an ISO that defendant's copyright did not "extend to the service market" for defendant's computers. *Id.* at 1337. The court noted:

> Triad invented, developed, and marketed its software to enable its customers and its own technicians to service Triad computers. Southeastern is getting a free ride when it uses that software to perform precisely the same service. Triad is entitled to licensing fees from Southeastern and other ISOs that make use of Triad's software in servicing Triad computers.

*Id.* The court also rejected Southeastern's copyright misuse defense. It affirmed the district court's ruling sustaining defendant's motion for summary judgment. *Id.* In rejecting plaintiff's earlier motion for summary judgment, the district court noted that "copyright owners like Triad are within their rights in using and enforcing restrictive license agreements." *Triad Sys. Corp. v. Southeastern Express Co.*, No. C 92–1539–FMS, 1994 WL 446049, at *14 (N.D.Cal. Mar. 18, 1994).

For these reasons and those stated by Judge O'Connor in *ISO Antitrust Litigation*, 989 F.Supp. at 1142–43, the Court sustains Xerox's motion for summary judgment on the misuse defense.[30]

### 5. *Willfulness of CCS Infringement*

▮▮▮ Xerox asks the Court to find as a matter of law that CCS willfully infringed its copyrights. To establish willfulness, Xerox must show that CCS knew that its conduct constituted infringement or that it acted in reckless disregard of Xerox rights. *See Wildlife Exp. Corp. v.*

*Carol Wright Sales, Inc.*, 18 F.3d 502, 511 (7th Cir.1994). Xerox contends that Blake told Dixon that reproduction of Xerox manuals was unlawful. This is not, however, what Blake said. Blake testified that he told Dixon that he would not copy anything that had a copyright on it and that he *may* have told Dixon that he was concerned about a copyright situation. *See id.* at 72, 74. Blake also testified that individuals made copies because they did not want their original manuals to get dirty or be damaged while they were working on copiers. *See id.* No evidence suggests that Dixon or CCS employees knew that copying manuals to preserve the originals constituted infringement. Likewise, Xerox has not shown that CCS acted in reckless disregard of Xerox rights by engaging in such copying. Given the inconclusive nature of Blake's testimony and the type of copying discussed, the Court cannot conclude as a matter of law that CCS engaged in willful infringement.

With respect to the Xerox motion for summary judgment on its copyright infringement counterclaim, the Court finds that CCS has infringed Xerox copyrights in service manuals for the model 1075 and 1090 copiers. The only issues remaining for trial on those manuals are whether the infringement was willful and the amount of damages. The Court overrules the Xerox motion for summary judgment with respect to CCS infringement of the model 1050, 5052 and 1065 manuals. The Court sustains Xerox's motion for summary judgment on the statute of limitations, fair use, misuse, estoppel and laches defenses. CCS may not assert these defenses to any copyright infringement claims by Xerox.

---

**30.** In its initial memorandum, Xerox argued that the CCS estoppel and laches defenses are also insufficient as a matter of law. CCS did not respond to these arguments and it failed to offer evidence to support the essential elements of these defenses. *See Bourne Co. v. Hunter Country Club, Inc.*, 990 F.2d 934, 937 (7th Cir.1993) ("[E]stoppel applies only if the copyright owner is aware of the infringing conduct yet acts in a way that induces the infringer reasonably to rely upon such action to his detriment"); *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 523 (10th Cir.1987) (to establish laches, defendant must show inexcusable delay by claimant in filing suit and resulting prejudice to defendant from such delay). The Court therefore sustains Xerox's motion with respect to these defenses.

**IT IS THEREFORE ORDERED** that *Xerox Corporation's Motion For Summary Judgment On Plaintiff's Antitrust Claims* (Doc. # 746) filed April 19, 1999, be and hereby is **SUSTAINED.**

**IT IS FURTHER ORDERED** that *Xerox Corporation's Motion For Summary Judgment On Plaintiff's Antitrust Claims Barred By The Statute Of Limitations* (Doc. # 742) filed April 19, 1999, be and hereby is **OVERRULED as moot.**

**IT IS FURTHER ORDERED** that Xerox's *Motion For Summary Judgment On Plaintiff's State Law Claims For "Defamation And Trade Disparagement" And Tortious Interference With Contract* (Doc. # 740) filed April 19, 1999, be and hereby is **SUSTAINED in part** and **OVERRULED in part.** The Xerox motion is overruled with respect to plaintiff's defamation claim based on the Xerox statement to Aetna representatives regarding training and with respect to plaintiff's tortious interference with contract claim based on the impact of Xerox parts policies on the CCS contract with the State of Connecticut. The Xerox motion is otherwise sustained.

**IT IS FURTHER ORDERED** that *Xerox Corporation's Motion For Summary Judgment On Its Copyright Infringement Counterclaims* (Doc. # 744) filed April 19, 1999, be and hereby is **SUSTAINED in part** and **OVERRULED in part.** The Court finds that CCS has infringed Xerox copyrights in service manuals for the model 1075 and 1090 copiers. The only issues remaining for trial on those manuals are whether the infringement was willful and the amount of damages. The Court overrules the Xerox motion for summary judgment with respect to CCS infringement of the model 1050, 5052 and 1065 manuals. The Court sustains Xerox's motion for summary judgment on the statute of limitations, fair use, misuse, estoppel and laches defenses. CCS may not assert these defenses to any copyright infringement claims by Xerox.

**IT IS FURTHER ORDERED** that *Xerox Corporation's Motion For Summary Judgment On Patent Infringement* (Doc. # 735) filed March 19, 1999, be and hereby is **OVERRULED in part** and **SUSTAINED in part.** The Court sustains the Xerox motion for summary judgment with respect to the CCS patent misuse defense. The Xerox motion is otherwise overruled.

**IT IS FURTHER ORDERED** that *Cross Motion By Creative Copier Service For Summary Judgment On Xerox's Patent Infringement Counterclaim* (Doc. # 756) filed May 3, 1999, be and hereby is **OVERRULED.**

**IT IS FURTHER ORDERED** that *Xerox Corporation's Motion To Strike The Declaration Of Donald Garvin* (Doc. # 766) filed June 1, 1999, be and hereby is **SUSTAINED.** The Declaration of Donald Garvin, attached as Exhibit 11 to *Memorandum Of Points And Authorities: (1) In Support Of Cross Motion By Plaintiff CCS For Summary Judgment On Xerox Counterclaim For Patent Infringement; And (2) In Opposition To Xerox' Motion For Summary Judgment On Patent Infringement Claim* (Doc. # 756) filed May 3, 1999, is **STRICKEN.**

**IT IS FURTHER ORDERED** that the *Motion By Creative Copier Service To Deem Admitted Matters Pursuant To Local Rule 56.1 And The Order Of April 21, 1999, And To Strike Matters From Xerox Reply Memoranda* (Doc. # 784) filed June 28, 1999, be and hereby is **SUSTAINED in part** and **OVERRULED in part** as discussed herein. The Declaration of John Jandrokovic, which is attached as Exhibit 2 to *Xerox Corporation's Reply Memorandum In Support Of Its Motion For Summary Judgment On Plaintiff's Antitrust Claims* (Doc. # 779) filed June 15, 1999, is **STRICKEN** from the record.